*For grant*—Justices LaVECCHIA and ALBIN and Judge STERN (temporarily assigned)—3.

*For dissent*—Justices RIVERA–SOTO and HOENS—2.

*Not Participating*—Chief Justice RABNER and Justice LONG—2.

20 A.3d 1123

PETER RISKO, INDIVIDUALLY AND AS ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF CAMILLE M. RISKO, A/K/A CARMELA RISKO, PLAINTIFFS–RESPONDENTS, v. THOMPSON MULLER AUTOMOTIVE GROUP, INC., T/A HAMMONTON CHRYSLER JEEP DODGE, DEFENDANT–APPELLANT.

Argued March 29, 2011—Decided June 7, 2011.

508

*William C. Carey* argued the cause for appellant (*McElroy, Deutsch, Mulvaney & Carpenter,* attorneys; *Mr. Carey, Loren L. Pierce* and *William A. Cambria,* on the briefs).

*Rudolph C. Westmoreland* argued the cause for respondents (*Westmoreland Vesper & Quattrone,* attorneys; *Mr. Westmoreland* and *Kathleen F. Beers,* on the briefs).

Judge STERN (temporarily assigned) delivered the opinion of the Court.

Pursuant to leave granted, plaintiff Peter Risko, individually and as administrator of the estate of his late wife, Camille Risko (decedent),[1] appealed to the Appellate Division from a June 30, 2009 order of the Law Division setting aside a jury verdict in their favor in this wrongful death and survivorship action, and granting a new trial to defendant Thompson Muller Automotive .Group, Inc., t/a Hammonton Chrysler Jeep Dodge (dealership). The Appellate Division reversed the grant of a new trial on both liability and damages, over Judge Carchman's dissent, which would have granted a new trial on damages only.

We thereafter granted defendant's motion for leave to appeal from the Appellate Division's judgment.[2] *Risko v. Thompson Muller Auto. Group, Inc.*, 204 *N.J.* 34, 6 *A.3d* 439 (2010). We cannot allow the award of damages to stand in light of plaintiff's summation and the trial judge's perception that a new trial was required. Accordingly, we reverse the Appellate Division in part, and order a new trial as to damages only, essentially for the reasons expressed in Judge Carchman's dissent.

---

[1] Risko and his wife's estate will hereinafter be referred to jointly as "plaintiff."

[2] Because the matter came to the Appellate Division on an interlocutory basis by leave granted, a motion for leave to appeal to this Court was properly filed before final judgment was entered. *R.* 2:2–5(a). Here the Appellate Division judgment may have permitted an appeal to us because there was no need for further proceedings in the trial court. *See R.* 2:2–5(a). *See also Shah v. Shah*, 184 *N.J.* 125, 132–33, 875 *A.2d* 931 (2005); *Pfau v. Trent Aluminum Co.*, 55 *N.J.* 511, 514, 263 *A.2d* 129 (1970). Defendant has the right to appeal based on the dissent following the entry of final judgment and review of the final judgment by the Appellate Division. *State v. Marrero*, 148 *N.J.* 469, 479–80, 691 *A.2d* 293 (1997). However, even when an appeal as of right may be taken because of a dissent in the Appellate Division, it may address only the portion of the judgment addressed in the dissent, *see Khan v. Singh*, 200 *N.J.* 82, 90–91, 975 *A.2d* 389 (2009); *State v. Allegro*, 193 *N.J.* 352, 371, n. 9, 939 *A.2d* 754 (2008). Here the dissent related only to the damage award.

## I.

We recount the relevant facts as developed in the Appellate Division's unpublished opinion.

On November 21, 2005, sixty-nine-year-old Camille Risko slipped and fell in defendant's automobile showroom. According to her husband, who accompanied her to the dealership, a plastic runner lying on top of the carpet was waterlogged at the time. Plaintiff's retail premises safety expert, Bill Julio, concluded that defendant allowed an area of the carpet in its showroom to become rain-soaked during a rainstorm and also allowed water to accumulate on its tiled floor. Julio opined that improper placement of the carpet and the black plastic runner over the carpet, leaving some wet and exposed tile, and the lack of adequate inspections created a "false sense of security," and an unreasonably hazardous and dangerous condition, which violated the standard of care. The condition of the floor was disputed by defendant's sales manager, Raymond Hall, who denied that the carpet was wet or that there were any plastic runners on top of the carpet.

Plaintiff alleged that as a result of the fall, Camille sustained a fractured arm and hip. The hip injury required surgery, and thereafter she spent several weeks in a rehabilitation center where she contracted C-difficile colitis, a severe inflammation of the colon. When the condition developed into septic shock, Camille was rushed to the hospital, where she died on January 1, 2006.

Plaintiff's medical expert, Dr. Donald Jason, a forensic pathologist, presently a medical examiner in North Carolina and Associate Professor at the Wake Forest Medical School, and also an attorney, concluded that Camille's hip fracture was caused by the "slip and fall," and her subsequent death from septic shock was ultimately the result of the injuries she sustained from the accident. Specifically, the doctor found that the decedent died from septic shock complicating her C-difficile colitis due to antibiotic therapy for a urinary tract infection. The infection, in turn, was caused by a urinary bladder catheterization that was necessitated by the fracture of decedent's hip caused by her slip and fall. Dr.

Jason believed that the slip and fall, as decedent had described it, caused the fractured hip.

Although defendant contested the connection between the carpet's condition and decedent's fall, between the fall and decedent's hip fracture, and between the fracture and her death, defendant produced no contrary medical proof or expert testimony.[3] As related to economic damages, plaintiff called economic expert, Dr. Robert P. Wolf, who opined that decedent would have lived for sixteen more years, during which she would have supplied emotional support for plaintiff, and that for 10.68 of those years, decedent would have been able to provide household services and physical support to her spouse. Dr. Wolf calculated that, based on these projections, plaintiff suffered economic loss in the amount of $143,988 in household services, $328,012 in "advice, counsel, support and companionship," and $562,307 in "passive security" constituting "sleep time [and] on-call services"[4] that a spouse provides. Dr. Wolf concluded that the sum of these figures, $1,034,307, represented the discounted value of plaintiff's economic loss. Defendant vigorously disputed the quantification and legitimacy of the "sleep time" calculations by plaintiff's expert.

At the close of evidence and following the court's final instructions, the jury returned a verdict finding defendant solely negligent, that its negligence was the proximate cause of Camille's fall and injuries, and that her left hip fracture was the cause of her death. The jury awarded plaintiff $1,210,319 for "financial losses sustained by the [decedent's] survivors" and $539,681 for pain and suffering before her death, for a total amount of $1,750,000.

Defendant moved for a new trial, primarily on the basis of comments by plaintiff's counsel in summation. Defendant urged

---

[3] The jury was advised that "the defense has stipulated that the death is causally related to the fracture[s]."

[4] Dr. Wolf defined "sleep time [and] on-call services" as the time decedent "was there and available to [plaintiff] for any specific needs that may have arisen."

that the summation was "completely inappropriate," unduly preju-
dicial and produced an "unjust result" because it suggested that
the jury had to find more than $1,000,000 in damages and directed
jurors to report to the judge any of their members who could not
do so because "they were violating the law" if they did. Moreover,
defendant asserted that "a strong and effective curative instruc-
tion [should have been] given to the jury." The trial court agreed,
and granted a new trial.

On appeal, plaintiff claimed the trial court erred in its grant of a
new trial, and a majority of the Appellate Division reversed the
decision. Judge Carchman dissented believing that a new trial on
damages was warranted, as the trial judge had ordered, but
agreed with the majority that a new trial as to liability was
unnecessary. He would have limited the new trial to damages
only.

## II.

Because plaintiff's counsel's summation was the exclusive basis
for the trial court's decision to set aside the verdict and grant a
new trial, we set it out at some length:

> [PLAINTIFF'S COUNSEL]: [T]he Eighth Amendment of the Constitution of the
> United States in the Bill of Rights says even prisoners of war, people we hate, are
> not supposed to be tortured. What [the decedent] went through was torture.
> They didn't intend to put her through that. But now they have to pay for that.
>
> . . .
>
> I have ... concerns. And this is from talking to other jurors and judges. And
> [the trial] judge.... When you go to deliberate if someone for some reason has not
> disclosed that they have a prejudice about awarding money in a death case please
> tell the judge because that would not be following the law. If someone starts to
> say I have a case or my uncle has a case, that has nothing to do with this case.
> Nothing.... And if someone goes into the jury room and says ... I don't believe
> in damages of over a million dollars, because there are people that believe that, you
> can never have a million dollar case. Well why? Well because I just don't believe
> that, it's what's called an arbitrary cap on damages. If someone says that in the
> jury room please knock, tell [the jury attendant], ask for the judge. Because what
> they're doing is ignoring the law.

The trial judge interrupted, and called counsel to sidebar, where
the following exchange occurred:

[Plaintiff's counsel]: Yes, Your Honor.

THE COURT: I'm going to mistry this case right now.

[PLAINTIFF'S COUNSEL]: Why?

THE COURT: Why? You know damn well that those are instructions that I give.

[PLAINTIFF'S COUNSEL]: There's no caps on damages—

THE COURT: It doesn't matter whether there's caps.

[PLAINTIFF'S COUNSEL]: I'm telling them there's no caps.

THE COURT: It doesn't matter whether there's caps. That's an improper instruction to give this jury at this point.

[PLAINTIFF'S COUNSEL]: To tell them to tell you if someone does that?

THE COURT: Yes, absolutely. That's their own individual view. That's your own individual view.

. . . .

THE COURT: You don't tell them to knock on the door. That's the point. That's the deal you don't get here. That's my job. You don't tell them when they knock on the door. I'm furious to say the least.

[PLAINTIFF'S COUNSEL]: I'm sorry, Your Honor. I believe it is proper for me to ask them if someone's not following the law, I know this was—

THE COURT: You finish this and I'm going to decide tonight whether I mistry this case.

[PLAINTIFF'S COUNSEL]: Yes, sir.

### The following then was stated in the presence of the jury:

[PLAINTIFF'S COUNSEL]: May I finish the comment, Judge, about the law that there's no caps in New Jersey? His Honor, I'm not telling you what the law is. His Honor will tell you what the law is. I'm simply saying there are no caps in the state of New Jersey in the law.

THE COURT: I will see counsel in chambers. Ladies and gentlemen of the Jury, we will see you tomorrow morning at 9 o'clock. Thank you.

Immediately thereafter a long off-the-record discussion was conducted in chambers between the court and both counsel. Both sides agree the following took place, as developed by defense counsel during the argument on the motion for a new trial:

[Defense counsel]: [I] just want to remind Your Honor of what took place after you had calmed down and after we were discussing things. [T]he indication . . . from the [c]ourt to counsel was to get to [c]ourt at approximately 8:45, [the next morning], and we would go over a curative instruction or we would see how further, at the very least, it may not have been that strong . . . there's obviously not a record to it, but . . . we were going to talk about what we needed to do further . . . . [Plaintiff's counsel] and I were both here at 8:45. And Your Honor came out at approximately 9:15, after the jury had been called. And [plaintiff's counsel] was told to continue.

Upon receiving the judge's instruction to continue summation, plaintiff's counsel apologized to the court and to the jury for his conduct and statements, and proceeded to complete his closing arguments. There were no objections by defense counsel. The judge did not request argument on whether to mistry the case and never asked the attorneys for suggested curative instructions. The judge did not give a specific cautionary instruction designed to address the concerns he voiced the previous afternoon and made no comment to the jury on the matter.

In his final instructions to the jury, however, the judge did explain, among other things, that statements by counsel as to damages were to be disregarded and the amount of damages, if any, was to be decided by the jury alone. He instructed:

> [K]eep in mind [that] by instructing you on damages [that] does not mean that I am ordering you to find damages. That's something that again you're the determiners of fact, that's entirely up to you. The amount of damages is entirely up to you ... That's something that is your province to deal with. It's not mine, it's not counsel's province. It's yours. You are the determiners of fact in this case.

The judge reiterated that the attorneys' remarks were not evidence, that the jury should consider only the evidence presented, and that the jury's recollection of the evidence controlled.

Following entry of the verdict, defendant moved for a new trial on all issues. In support of its motion, defendant argued, among other things, that plaintiff's summation created "uncertainty amongst jurors of a free and fair deliberation that someone may be in the jury room looking to see if there was some type of undue bias." Plaintiff disagreed with defendant's characterization of his remarks as informing the jury that "the verdict in this case ... can't be[,] as a matter of law[,] less than a million dollars" and challenged defendant's failure to object or request a curative instruction when the court reconvened the next morning. Specifically, plaintiff's counsel argued it was unfair for defendant to "hope" for a "no cause" and then "come back and say well ... the judge should have ruled a mistrial.... If ... the defense position now is ... you didn't give an instruction at all, you gotta say something then. We could have argued then."

The trial judge rejected all the evidential issues raised by defendant as not "sufficient to constitute grounds ... to grant a mistrial." However, the judge found "the crux of the matter" to be plaintiff's summation, which, as previously noted, he believed to warrant a new trial on both liability and damages. Acknowledging that he should have either declared a mistrial or given immediate cautionary instructions, the judge said: "I was hoping that based on the verdict that perhaps we would come up with a fair and equitable verdict or we might come up with one, quite frankly, as hoped by the defense, which would be moot." The judge then explained the rationale for his grant of a new trial:

[W]hat concerns me with this trial is two things; [plaintiffs' counsel's] conduct and my lack of response to that. I don't think [defense counsel] needed to have an objection based upon my reaction when it was stated to the jury that there was an issue of caps. Certainly my reaction would indicate that the world was ready to explode. And I think most judges would have declared a mistrial right there. But I don't lightly declare mistrials.... And it wasn't until my instructions weren't followed a second time that I thought well, it's now 4:30 in the afternoon, let's go back and punt, everybody cool down and let me send the jury home anyway.... But it's obvious that my first rebuke didn't work because when [plaintiffs' counsel] turned and said to me should I continue to tell them about caps, obviously nothing that I said got through.... [W]hat [defense counsel] said here is absolutely correct at least to the best of my memory, that [I said] we would consider instructions the next day. So let me go back and look at those two elements.... I'm trying to create an atmosphere in which [the jury] can decide a case fairly and objectively knowing that what they do in that jury room is inviolate. It's something that is their decision at that point. And I think with what was said to them in the last closing arguments, the last moments of plaintiff's closing argument violated that rule. Now what rule did it violate? Very simply put, to tell the jury that if one person doesn't believe in the million dollar case despite the fact that there is a law in New Jersey that we don't have caps created what I'm going to describe as a vigilante atmosphere. We had a member of a jury or members of a jury who if somebody was disagreeing with them as to an amount were being instructed by plaintiff's counsel to let [the jury attendant] know so that [she] could let the judge know. In other words, let's find out who the tattle-tale is in this process. I don't think that creates the type of atmosphere that we want in jury decisions.... *[T]he message that was sent to that jury was if someone doesn't believe in the million dollar case that somehow they should be turned in,* that somehow they should be excised from the group. And that's not what we do when juries are deciding.... [I] think that's the atmosphere that was created. Should I have instructed them that that's not the case? Yes. Did I do it? No. Why? Because I was hoping that based upon the verdict that perhaps we would come up with a fair and equitable verdict or we might come up with one, quite frankly, as was hoped by defense, which would be moot. We wouldn't have to get to that.

[ (Emphasis added).]

The judge concluded that he was "compelled," based on "the interest of fairness," the "conduct" of plaintiff's counsel, and his own "lack of an inhibiting instruction" to grant a new trial. The judge further explained his order included a new trial as to liability because he had to "assume all of it," "the entire process was tainted."

## III.

In reversing the award of a new trial, the Appellate Division majority noted it was "unclear whether the judge's objection was to the substantive content" of the summation or the "perceived usurpation of the court's charging prerogative" and if the former, that the trial court failed to strike the "offending remark[s]" or issue a curative instruction, as would be expected if the court truly found portions of plaintiff's summation objectionable. The majority similarly highlighted defendant's lack of objection to the summation and failure to request a mistrial or offer a corrective jury charge. The lack of action by both the trial court and defendant, according to the majority, "bespeaks the benign nature of the remarks that later formed the exclusive basis for the grant of a new trial."

The majority was careful to emphasize its displeasure with plaintiff's suggestion of a $1 million damages floor and commentary on how the jurors should conduct their deliberations, but declined to characterize those comments as "inflammatory" or "unfairly prejudicial." Rather, the majority, viewing plaintiff's remarks "in context," found them to be "brief and fleeting," stating:

> We do not view such commentary as either blatant bullying of the jury or a deliberate attempt to abrogate the court's charging function. Nor do we agree with the trial judge's harsh characterization that counsel's remarks created a "vigilante atmosphere" in the jury room. While counsel's comment to the jury about communicating with the court was clearly inappropriate, we do not discern any of the dire consequences attributed to it by the judge. The reference, just as reasonably, may be construed as a call to the jury to follow the law, consult with

the court for clarification if any confusion arises, and avoid basing its decision merely on an arbitrary dislike for damage awards over $1 million.

The panel also found mitigating conduct in the form of an apology by plaintiff's counsel and the court's final instructions to the jury on the day after the summation, approvingly quoting those instructions as follows:

keep in mind [that] by instructing you on damages [that] does not mean that I am ordering you to find damages. That's something that again you're the determiners of fact, that's entirely up to you. The amount of damages is entirely up to you. . . . That's something that is your province to deal with. It's not mine, it's not counsel's province. It's yours. You are the determiners of fact in this case.

Additionally, the panel found curative the court's emphasis in its instructions on the "dignity and sanctity of the jury room, and the wide latitude within which it operates," as well as "general language to the effect that statements by the attorneys were not evidence, and were to be disregarded if they conflicted with a juror's recollection of the testimony. In light of the seemingly benign nature of the summation remarks and the mitigating instructions issued in response, the panel stated:

We are satisfied that the trial judge's "clear and firm" jury charge cured any potential for prejudice created by plaintiff's counsel's summation remarks. *City of Linden v. Benedict Motel Corp.*, 370 *N.J.Super.* 372, 398 [851 *A.*2d 652] (App.Div.), *certif. denied*, 180 *N.J.* 356 [851 *A.*2d 650] (2004). The isolated lapses in closing argument alone were not sufficient to constitute a "miscarriage of justice," as evidenced by a jury verdict supported by the trial proofs.

. Finally, after citing the role of the trial judge and its scope of review, the majority concluded:

We find that the jury verdict is supported by the record. We, therefore, are not "clearly and convincingly" persuaded that it would be manifestly unjust to sustain the award because of counsel's claimed lapses. They were neither flagrant, multiple, or continuing. Moreover, the court's jury instructions were sufficient to ameliorate any prejudicial effect arising from counsel's isolated comments in closing argument. After all, "[w]hile a [litigant] is entitled to a fair trial, he is not entitled to a perfect trial." *State v. Swint*, 328 *N.J.Super.* 236, 261 [745 *A.*2d 570] (App.Div.), *certif. denied*, 165 *N.J.* 492 [758 *A.*2d 651] (2000) (citing *State v. Feaster*, 156 *N.J.* 1, 84 [716 *A.*2d 395] (1998), *cert. denied sub nom. Kenney v. New Jersey*, 532 *U.S.* 932, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001)). Accordingly, we conclude the judge abused his discretion in granting defendant's motion for a new trial.

Judge Carchman's partial dissent was "of the view that [the summation] exceeded the boundaries of proper advocacy, warranting a new trial as to damages." According to the dissent:

> During his summation, counsel misquoted the Eighth Amendment of the Constitution of the United States as referring to prisoners of war and stated that "even prisoners of war, people we hate, are not supposed to be tortured. What [decedent] went through was torture." He did qualify his comments by stating "They didn't intend to put her through that[,]" but then added "[b]ut now they have to pay for *that*." (Emphasis added.) This case did not involve prisoners of war or torture but was an action for damages resulting from a slip and fall on a rug in an auto dealership resulting in multiple fractures. This was followed by complications in the hospital and, ultimately, death. No one can argue that plaintiff's injuries were not substantial or painful, but counsel's suggestion, linking and equating defendant's conduct to torture as well as invoking some conjured protection under the Bill of Rights, was neither fair commentary on the evidence nor an argument free from the potential for injustice. *Jackowitz v. Lang,* 408 *N.J.Super.* 495, 505 [975 *A.2d* 531] (App.Div.2009). These arguments were designed to inflame the jury and were unwarranted.[5]

Judge Carchman continued with reference to the inappropriate comments relating to what the trial judge called "vigilantism" if a $1,000,000 verdict was not returned:

> Eager to impress the jury with the proper argument that there are no caps on damages, counsel presented the jury with hypothetical examples of conduct by jurors that, according to counsel, necessitated the jury reporting such conduct to the judge. Counsel alluded to a hypothetical juror suggesting that the juror did not believe in damages over a million dollars or talking about a reference to "my case or my uncle has a case," and then instructed the jury to "ask for the judge. Because what they're doing is ignoring the law."

> As the majority recognizes, the jury room, during deliberations, must be a sanctuary for free and open discussion among jurors without a scenario of juror's overtly policing the conduct and comments of other jurors. There are instances when jurors may say and act inappropriately, injecting inappropriate racial or bias commentary that has no place in deliberations, and those comments should be brought to the judge's attention. But where the issue is the quantum of damages, and the judge properly instructs the jury as to the elements and factors relevant to a jury award, we assume jurors follow the law as instructed. We entrust and leave to the other jurors the obligation to counsel those jurors who might misunderstand or suggest award biases that the judge has instructed otherwise, and the verdict

---

[5] The dissent did not see a need for a new trial as to liability stating, "For reasons that are not clearly articulated in the trial record, the trial judge ordered a new trial as to liability as well as damages. I concur in the majority's conclusion that a new trial as to liability was not warranted."

must be rendered within the framework of the judge's instructions. Counsel cannot advise jurors during summation that they are obligated to report to the judge any comments or colloquy they might hear as part of the deliberative process that might be interpreted as limiting damages.

But there is a more troublesome context at play here. Counsel's constant references to the million dollar verdict as a threshold for reporting on a fellow juror violates a basic principle of our jurisprudence regarding damage summations. Embedded in our rules is the clear prohibition against suggesting a verdict. *Botta v. Brunner*, 26 *N.J.* 82, 99 [138 *A.2d* 713] (1958). Counsel's comments, in the guise of an admonition to the jury, involved a repeated reference to a million dollars as the threshold verdict. I acknowledge that the proofs "on the board" exceeded that amount, and counsel was at liberty to comment on the proofs presented by his economic experts, yet he was not free to suggest to the jury that a verdict less than a million dollars was in some way the imposition of a cap on damages or malfeasance on the part of a fellow juror. The argument was carefully conceived and crafted to suggest a minimum award to plaintiff in violation of well-established jurisprudence.

The cumulative impact of these comments was such as to so taint this damage verdict and warrant a new trial as to damages.

## IV.

■ We likewise conclude that a new trial on damages is warranted based on the "cumulative" effect of the summation notwithstanding the final instructions to the jury. Stated differently, we cannot tolerate the suggestion to jurors that they would be violating the law, and will be reported to the judge, if they reject the notion that plaintiff's case could be worth more than $1,000,000. Moreover, the trial judge concluded that a new trial was warranted, and he is entitled to deference on that subject.

While there was no dissent on the reversal of the new trial as to liability, it is before us on leave to appeal. But there is no need to address it at length, *see Caldwell v. Haynes*, 136 *N.J.* 422, 443, 643 *A.2d* 564 (1994) (granting new trial on damages without discussion of need for new trial as to liability), because defendant has not demonstrated that the summation concerning damages somehow affected the findings as to liability. *Cf. Ahn v. Kim*, 145 *N.J.* 423, 434, 678 *A.2d* 1073 (1996) (explaining that "issues in negligence cases should be retried together unless the issue unaffected by error is entirely distinct and separable from the other issues");

*Conklin v. Hannoch Weisman, P.C.,* 145 *N.J.* 395, 411, 678 *A.*2d 1060 (1996) (ordering retrial of both proximate causation and negligence because the issues were not "distinct and separable"). *Accord Ogborne v. Mercer Cemetery Corp.,* 197 *N.J.* 448, 461, 963 *A.*2d 828 (2009) (holding that issues of proximate causation and comparative negligence were "intertwined" with issue of duty, thereby requiring retrial on all three issues).

It is axiomatic that a motion for a new trial should be granted only after "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." *R.* 4:49–1(a). A jury verdict is entitled to considerable deference and "should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice." *Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 597–98, 379 *A.*2d 225 (1977). That is, a motion for a new trial "should be granted only where to do otherwise would result in a miscarriage of justice shocking to the conscience of the court." *Kulbacki v. Sobchinsky,* 38 *N.J.* 435, 456, 185 *A.*2d 835 (1962). In fact, in *Carey v. Lovett,* 132 *N.J.* 44, 66, 622 *A.*2d 1279 (1993), we expressly stated that a "trial court should not disturb the amount of a verdict unless it constitutes a manifest injustice...." Thus, a trial judge is "not [to] substitute his [or her] judgment for that of the jury merely because he [or she] would have reached the opposite conclusion...." *Dolson v. Anastasia,* 55 *N.J.* 2, 6, 258 *A.*2d 706 (1969).

A "miscarriage of justice" has been described as a "'pervading sense of "wrongness" needed to justify [an] appellate or trial judge undoing of a jury verdict ... [which] can arise ... from manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, [or] a clearly unjust result....'" *Lindenmuth v. Holden,* 296 *N.J.Super.* 42, 48,

685 *A.*2d 1351 (App.Div.1996) (quoting *Baxter, supra,* 74 *N.J.* at 599, 379 *A.*2d 225).

The standard of review on appeal from decisions on motions for a new trial is the same as that governing the trial judge—whether there was a miscarriage of justice under the law. *Bender v. Adelson,* 187 *N.J.* 411, 435, 901 *A.*2d 907 (2006); *Diakamopoulos v. Monmouth Med. Ctr.,* 312 *N.J.Super.* 20, 36–37, 711 *A.*2d 321 (App.Div.1998). However, in deciding that issue, an appellate court must give "due deference" to the trial court's "feel of the case." *Jastram v. Kruse,* 197 *N.J.* 216, 230, 962 *A.*2d 503 (2008); *see also R.* 2:10–2; *Carrino v. Novotny,* 78 *N.J.* 355, 360, 396 *A.*2d 561 (1979).

In granting the new trial, the judge focused on the portion of plaintiff's summation which, according to the court, suggested a damages floor of $1,000,000 and encouraged jurors to report those of its members who disagreed with the ability to return a verdict. Summations must be "fair and courteous, grounded in the evidence, and free from any 'potential to cause injustice.'" *Jackowitz v. Lang,* 408 *N.J.Super.* 495, 505, 975 *A.*2d 531 (App.Div.2009) (quoting *Geler v. Akawie,* 358 *N.J.Super.* 437, 463, 818 *A.*2d 402 (App.Div.), *certif. denied,* 177 *N.J.* 223, 827 *A.*2d 290 (2003)). Where they cross the line beyond fair advocacy and comment, and have the ability or "capacity" to improperly influence the jury's "ultimate decision making," *Bender, supra,* 187 *N.J.* at 416, 435, 901 *A.*2d 907, the trial judge must take action. But here he did nothing immediately—at a time when he could have remedied the problem.

Certainly "'counsel is allowed broad latitude in summation....'" *Bender, supra,* 187 *N.J.* at 431, 901 *A.*2d 907 (quoting *Colucci v. Oppenheim,* 326 *N.J.Super.* 166, 177, 740 *A.*2d 1101 (App.Div.1999), *certif. denied,* 163 *N.J.* 395, 749 *A.*2d 369 (2000)). "Counsel's arguments are expected to be passionate, 'for indeed it is the duty of a trial attorney to advocate.'" *Jackowitz, supra,* 408 *N.J.Super.* at 504–05, 975 *A.*2d 531 (quoting *Geler, supra,* 358

*N.J.Super.* at 463, 818 *A.*2d 402). "There is no harm in seeking to maximize a recovery, even when incidental benefit is thereby achieved." *Geler, supra,* 358 *N.J.Super.* at 463, 818 *A.*2d 402. "Moreover, the '[f]ailure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made,' and it 'also deprives the court of the opportunity to take curative action.'" *Jackowitz, supra,* 408 *N.J.Super.* at 505, 975 *A.*2d 531 (quoting *State v. Timmendequas,* 161 *N.J.* 515, 576, 737 *A.*2d 55 (1999), *cert. denied,* 534 *U.S.* 858, 122 *S.Ct.* 136, 151 *L.Ed.*2d 89 (2001)). "Where defense counsel has not objected, we generally will not reverse unless plain error is shown." *Ibid.* (quoting *R.* 2:10–2).

 We have previously discussed the sanctity of the deliberation room and the need for it to be free from extraneous influence so that the jury can fulfill its duty as fact finder. *Williams v. James,* 113 *N.J.* 619, 632, 552 *A.*2d 153 (1989); *State v. Corsaro,* 107 *N.J.* 339, 346, 526 *A.*2d 1046 (1987) (referring to criminal prosecution). "The key to the proper discharge of this duty by the jury is the deliberative process, which must be insulated from influences that could warp or undermine the jury's deliberations and its ultimate determination." *Corsaro, supra,* 107 *N.J.* at 346, 526 *A.*2d 1046 (citing *State v. Czachor,* 82 *N.J.* 392, 413 *A.*2d 593 (1980); *State v. Simon,* 79 *N.J.* 191, 398 *A.*2d 861 (1979)). A jury verdict must be "based solely on legal evidence ... and entirely free from the taint of extraneous considerations and influences." *Panko v. Flintkote,* 7 *N.J.* 55, 61, 80 *A.*2d 302 (1951). Additionally, "the [deliberative] process [ ] is the vehicle for the collective mutual decision-making that reflects community views." *Williams, supra,* 113 *N.J.* at 632, 552 *A.*2d 153 (citing *Corsaro, supra,* 107 *N.J.* at 349, 526 *A.*2d 1046). "It is therefore necessary to structure a process and create an environment so that the mutual or collective nature of the jury's deliberations is preserved and remains intact until a final determination is reached." *Corsaro, supra,* 107 *N.J.* at 349, 526 *A.*2d 1046.

██ Counsel's instruction to the jury that they should knock on the door and inform the judge hindered this "collective mutual decision-making." A juror who dissented from, or even questioned, the quantum of damages that was being discussed may have been discouraged from voicing his or her thoughts out of fear of being reported to the judge. Although it is true that some biases should be reported to the judge, such as racial bias, *see generally State v. Scherzer*, 301 *N.J.Super.* 363, 489–90, 495–96, 694 *A.*2d 196 (App.Div.1997) (differentiating racial and religious biases from other types of influences), disagreement as to the quantum of damages does not require such action. That appeal to vigilantism, as perceived by the judge, crossed the line and introduced an "extraneous consideration[ ] [or] influence[ ]" which requires a new trial as to damages. *Panko, supra*, 7 *N.J.* at 61, 80 *A.*2d 302. *See also Bender, supra*, 187 *N.J.* at 431, 901 *A.*2d 907; *Jackowitz, supra*, 408 *N.J.Super.* at 504–05, 508–09, 975 *A.*2d 531. Further, given the standard of review and "due deference" owed to the trial judge's "feel of the case," *see Jastram, supra*, 197 *N.J.* at 230, 962 *A.*2d 503, we agree that a new trial on damages is warranted. In the absence of an articulated basis by the trial judge for going beyond that, we agree with the entire Appellate Division panel that nothing further need be retried.

A new trial is the appropriate remedy here, in the absence of an immediate curative instruction, because of the "miscarriage of justice." *Johnson v. Scaccetti*, 192 *N.J.* 256, 280, 927 *A.*2d 1269 (2007). *See also Bender, supra*, 187 *N.J.* at 433, 435, 901 *A.*2d 907; *Geler, supra*, 358 *N.J.Super.* at 471, 818 *A.*2d 402 ("[T]he absence of curative instructions heightened the already damaging effect of counsel's ill-considered words and increased the likelihood that the jury believed counsel's remarks to have been proper."); *Krohn v. NJ Full Ins. Underwriters Assoc.*, 316 *N.J.Super.* 477, 484–85, 720 *A.*2d 640 (App.Div.1998), *certif. denied*, 158 *N.J.* 74, 726 *A.*2d 937 (1999); *Diakamopoulos, supra*, 312 *N.J.Super.* at 35–37, 711 *A.*2d 321.

## V.

As leave to appeal was granted by the Appellate Division, other evidentiary issues were raised before that court. While we also granted leave to appeal, it was to consider whether a new trial as to damages was warranted and, if so, whether a new trial as to liability was also necessary. The evidentiary issues were not addressed by the Appellate Division which obviously found no basis for upsetting the verdict on those grounds. We also find no basis for addressing them prior to the new trial.

We therefore reverse the Appellate Division in part and remand for a new trial as to damages only.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

The majority "conclude[s] that a new trial on damages is warranted based on the 'cumulative' effect of the summation notwithstanding the final instructions to the jury." *Ante* at 520, 20 *A.*3d at 1132–33. It limits the relief to be afforded defendant "because defendant has not demonstrated that the summation concerning damages somehow affected the findings as to liability." *Ibid.* Because that conclusion is based in equal parts on an incorrect recital of the trial court's determination and an inappropriately expansive view of the scope of appellate review applicable here, I must dissent from so much of the majority's opinion that grants a new trial limited to damages only. In my view, the better and more correct result is the one reached by the trial court: the grant of a new trial on both liability and damages.

After the unnecessary flights of rhetoric contained in plaintiff's summation, the trial court's palpably adverse reaction thereto, the later self-admitted failure of the trial court to address those concerns, and the return of the jury's verdict in plaintiff's favor, all as described in the majority's opinion, *ante* at 513–15, 20 *A.*3d at 1127–29, defendant moved for a new trial. The trial judge, after explaining he was granting defendant's motion for a new trial based on two independent but intertwined reasons—the comments

of plaintiff's counsel in summation, and the trial court's failure to address them through a contemporaneous limiting instruction—engaged in the following exchange with plaintiff's counsel:

[PLAINTIFF'S COUNSEL]: You're ordering a new trial on all issues?

THE COURT: Yes.

[PLAINTIFF'S COUNSEL]: And the reason for the new trial on the liability issue would be?

THE COURT: I think *the entire process was tainted.* And obviously *I can't go to that jury now and find out how they were influenced,* that's something we don't do, so *I have to assume that all of it was tainted. I don't want to. I would love to be able to cut this down, but I don't think I can.* . . .

[ (emphasis supplied).]

In making that determination, the trial judge, as he is duty-bound to do, clearly was relying on "the intangible 'feel of the case' which he has gained by presiding over the trial." *Dolson v. Anastasia,* 55 *N.J.* 2, 6, 258 *A.*2d 706 (1969); *see also Pellicer ex rel. Pellicer v. St. Barnabas Hosp.,* 200 *N.J.* 22, 58, 974 *A.*2d 1070 (2009) (explaining that "[o]rdinarily we rely on trial courts and their firsthand 'feel of the case' as it bears on an analysis of whether the jury's verdict was motivated by improper influences. *Baxter* [ *v. Fairmont Food Co.*], 74 *N.J.* [588, ]600[, 379 *A.*2d 225 (1977) ] (acknowledging trial court's 'feel of the case' is advantageous as compared with appellate court's dependence on cold record); *see Fritsche v. Westinghouse Elec. Corp.,* 55 *N.J.* 322, 330 [261 *A.*2d 657] (1970) ('[a]n appellate court . . . lacks the opportunity to observe and hear the witnesses who appear before the trial judge and jury')").

In *Dolson, supra,* this Court explained that the relevant question on a motion for a new trial is " 'whether the result strikes the judicial mind as a miscarriage of justice,' " 55 *N.J.* at 6, 258 *A.*2d 706 (quoting *Kulbacki v. Sobchinsky,* 38 *N.J.* 435, 459, 185 *A.*2d 835 (1962) (Weintraub, C.J., and Jacobs and Francis, J.J., dissenting)), and that "[t]he standard governing an appellate tribunal's review of a trial court's action on a new trial motion is essentially the same as that controlling the trial judge." *Id.* at 7, 258 *A.*2d 706 (citing *Hager v. Weber,* 7 *N.J.* 201, 212, 81 *A.*2d 155 (1951));

*see also City of Long Branch v. Liu,* 203 *N.J.* 464, 492, 4 *A.*3d 542 (2010) (noting that "[a]n appellate court's review of a trial court's ruling on ... a motion for a new trial is similarly limited. *See Jastram v. Kruse,* 197 *N.J.* 216, 230, 962 *A.*2d 503 (2008) (noting that appellate 'inquiry requires employing a standard of review substantially similar to that used at the trial level, except that the appellate court must afford due deference to the trial court's feel of the case' (citation and internal quotation marks omitted))").

In light of those authorities, then, the majority's opinion begs the question of how one can reach the conclusion it does—granting a new trial on damages only—without referencing and of necessity deferring to the trial judge's unequivocal "feel of the case," one which compelled him, albeit most reluctantly, to grant a new trial on both liability and damages. In the context of this appeal, there is no reason to second-guess the trial judge, particularly one who no doubt was haunted by his failure to deal contemporaneously with what everyone agrees are inappropriate summation comments. Therefore, respecting the deference appellate courts owe to a trial judge in these circumstances, I would reverse the judgment of the Appellate Division in its entirety and reinstate the order of the trial court that granted a new trial on both liability and damages. To the extent, then, that the majority reverses the judgment of the Appellate Division only insofar as to granting a new damages trial but not as to liability, I respectfully dissent.

*For affirmance in part/reversal in part/remandment*—Chief Justice RABNER, Justices LONG, LaVECCHIA, ALBIN, HOENS and Judge STERN (temporarily assigned)—6.

*For concurrence in part/dissent in part*—Justice RIVERA-SOTO—1.