**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0780-22

COLLEEN HARRINGTON,

    Plaintiff-Appellant,

v.

LUTHER COLE,

    Defendant-Respondent.

_____

Argued October 4, 2023 – Decided November 30, 2023

Before Judges Currier and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Sussex County, Docket No. L-0383-19.

Roy J. Thibodaux III argued the cause for appellant (Berkowitz, Lichtstein, Kuritsky, Giasullo & Gross, LLC, attorneys; Roy J. Thibodaux III, of counsel and on the briefs).

Brandon R. Cohen argued the cause for respondent (Goldberg, Miller & Rubin, PC, attorneys; Claire Neiger, on the brief).

PER CURIAM

In this matter arising out of a 2017 motor vehicle accident, plaintiff appeals from the October 21, 2022 order denying her motion for a new trial on damages. We affirm.

Plaintiff alleged in her complaint that she sustained severe and permanent injuries as a result of defendant's negligent actions in operating his motor vehicle and failing to stop his car at a stop sign. Prior to trial, she filed a motion in limine seeking a directed verdict against defendant on the issue of liability. Relying on Seoung Ouk Cho by Yunjin Jo v. Trinitas Reg'l Med. Ctr., 443 N.J. Super. 461, 470 (App. Div. 2015), the trial judge denied the motion, finding it was in essence a motion for partial summary judgment on the issue of liability and not an appropriate motion in limine. The judge concluded the jury would consider and determine the issues of liability and comparative negligence.

The case proceeded to trial in September 2022. Defendant died, unrelated to the car accident, prior to the trial. Defense counsel stipulated defendant was negligent but did not concede defendant's negligence was the sole proximate cause of the accident or the proximate cause of plaintiff's injuries and damages.

During her opening statement, defense counsel made the following comments: "Unfortunately, I am sitting alone because [defendant], who was in his [seventies] at the time of this accident—[seventy-six or seventy-five]—is no

2

longer with us. His wife is not able to be here either"; "Everyone agrees, and you'll hear this testimony, that [defendant] told the police right away that he did not see the stop sign. He accepted responsibility from the very first minute at the scene of the accident. . . . He accepted responsibility"; and "[Defendant] admitted it right at the scene—he didn't see a stop sign."

During her testimony, plaintiff stated she was driving at a speed of twenty-five to thirty miles per hour and there was no traffic device controlling her travel through the intersection. Although emergency personnel came to the scene, plaintiff did not go to the hospital the day of the accident.

However, the next day, plaintiff went to the emergency department. She told the jury of her complaints:

> My head, the blistering headache I had. My chest, I couldn't breathe. My hands were buzzing, but there was something else wrong with my right hand that I felt that it just wasn't right. My bladder, it was just— I had to go to the bathroom every five minutes it just seemed, but I didn't have to go. And then I had a pain in my stomach that just came and went and came and went.

Plaintiff was released that same day after CT scans and x-rays were done. One week later, plaintiff returned to the emergency department complaining that "it . . . seemed to be getting worse" because she could not breathe, had an

"incredibl[e]" pressure in her head, a sore neck, and a "hard time functioning." After further testing, plaintiff was released that day.

Plaintiff then sought medical treatment from her primary care physician, Dr. David Bollard, for her continued complaints regarding her head, neck, hands, chest, lower rib, belly, and bladder. Plaintiff testified that Dr. Bollard gave her a nebulizer for her lungs, blood pressure medication, a recommendation for physical therapy for her neck, and referrals to a neurologist and hand specialist.

In 2017, plaintiff underwent "seven or eight visits" of physical therapy for her head and neck complaints "and . . . a little bit with [her] arm or . . . hand." She was later treated by a second physical therapist for her "[h]eadaches, neck pain, [and] hand issues." In June of 2019, plaintiff received an injection in her back which she testified alleviated her headaches and lessened the pain in her neck. A year later, plaintiff attended forty physical therapy sessions to treat her headaches and neck pain and some "strengthening and even some stuff with my hand."

Plaintiff also consulted with a neurologist for her complaints of "[h]ead and neck issues, screaming in [her] ear, [and] dizziness." According to plaintiff,

A-0780-22

the neurologist told her to "take it easy" and prescribed medication, which plaintiff took for two to three weeks.

For the "stinging" in her hands and the loss of mobility in her thumb, plaintiff saw a hand specialist, Dr. Leigh Ende, three or four times in 2017. She underwent an MRI, wore a hand splint, and had two or three injections in her hand and thumb. After that specialist retired, plaintiff sought treatment on three occasions from Dr. Michael Pizzillo, an orthopedist, for complaints of a "lack of sensation in [her] hand, the numbness, the thumb, the pain in [her] thumb and just the overall strength or loss of strength." Treatment included an MRI, injections, and wearing a splint.

Plaintiff next sought treatment from Dr. Frank Capecci for complaints of dizziness and headaches, as well as pain and numbness in her right hand. She saw Dr. Capecci three times and underwent an MRI of her neck. The doctor referred her to neurologist Dr. Mark Diamond and hand surgeon Dr. Abram Kirschenbaum. Plaintiff was treated by Dr. Diamond three times for "dizziness that wouldn't stop and the ear screaming and the headaches." She was treated by Dr. Kirschenbaum in 2019 for complaints of a "lack of sensation in [her] hand and the pain in [her] thumb and . . . palm." After treatment comprised of x-rays, an EMG study, injections, and a splint, plaintiff underwent surgery to

5

her right hand in 2019 during which two sesamoid bones were removed and the carpal tunnel inflammation was released. After the surgery, plaintiff underwent approximately fourteen occupational therapy sessions which relieved the "stabbing pain" she experienced "all the time . . . in [her] thumb . . . to just . . . like an ache and an issue if [she] use[d] it in a certain direction."

Plaintiff told the jury she injured her head, neck, hands, chest, ribs, colon, and bladder in the car accident. She denied any prior injuries to any of those body parts. She stated she was not involved in any other accident in which she suffered any injuries prior to or after the subject accident, though she was involved in two "fender bender" accidents in 2010 or 2012 and in 2021 but suffered no injuries.

Plaintiff testified she went on a trip to Ireland after the accident with her sisters and mother. So that she could "function," plaintiff stopped taking all her medication, and instead received an injection in her spine. She said during the trip she was "outpaced" by her sisters and not always "up to the daily activity."

Plaintiff stated she remains a self-employed owner of a "home heating oil and diesel fuel" delivery business with four employees. She handles "[t]he accounting, the bookkeeping, answering phones, taxes, everything that would encompass owning a business . . . ." She testified that she is right-hand dominant

and, as part of her job, she answers phone calls and handwrites orders with her dominant hand, although it takes longer to write down the orders and by the end of the day her hand is a "claw." After she writes down the orders, she inputs the information into the computer.

Plaintiff bought a horse in 2015 and learned to ride. However, she has been unable to ride the horse since the accident. She now only handles and cares for the horse once or twice a week. She described herself as a "couch potato" due to her intense headaches and dizziness. She stated she could no longer maintain as large a garden as she had prior to the accident and could not take care of the household functions for which she now hires professionals. At the time of the accident, plaintiff's boyfriend and his daughter lived with her.

Plaintiff, who was fifty-eight years old at the time of trial, testified that "today" she complains of headaches and a dizziness that "comes and goes" when she is laying down and changes the position of her head. She stated,

> [T]here's a lot of ache in the back of my neck and it radiates up to . . . the back of my skull. My hand is still numb. There's a level of degree of lack of sensation. My thumb doesn't work one hundred percent. . . .
>
> I can't lean on my palm. Can't open doors. I can't, you know, put—if I put pressure on it, I can do it, it's just very painful.

Plaintiff testified she takes Tylenol once or twice a week.

A-0780-22

According to plaintiff, her general health was "great" prior to the accident, although she testified to having Hashimoto's Disease (a thyroid condition), asthma, and mitral valve regurgitation. She takes medication for her thyroid, a statin for cholesterol, and uses an inhaler and a nebulizer for asthma. She had surgery in her right elbow to reattach a ligament "more than ten years ago" that involved two months of physical therapy.

Plaintiff presented Dr. Matthew Zornitzer, a board-certified orthopedic surgeon as her expert witness. He examined plaintiff on June 29, 2020. At that time, plaintiff complained of:

> [N]umbness and tingling that she said started immediately after the accident hadn't resolved even after the surgery. She had numbness in all five fingers on [her] right side. She stated that she had . . . some numbness on [her] left side after the accident but the left numbness and tingling resolved. She said [her] right hand ached. She had constant pain that she had prior to the surgery that resolved but she did still have pain even after the surgery but she stated she had—if she overdid it. She had difficulties opening bottles, pulling up her pants and washing dishes and she also said she was no longer able to ride her horse and she drops things and felt that her right hand was weak.

Based on his examination of plaintiff and review of her medical records, Dr. Zornitzer opined that plaintiff had carpal tunnel syndrome and injuries to her

A-0780-22

sesamoids[1] as a result of the accident.  In addition, she had a scar by her carpal

tunnel and her thumb where she had surgery.  His examination revealed plaintiff

had decreased grip strength and sensation.  Dr. Zornitzer stated that:

> [Plaintiff] had a scar at the . . . crease . . . [of] her right thumb, that was healed.  There was no triggering[,] meaning [her] thumb was not getting stuck and clicking when she flexed it, and she was not tender in this location.  She was able to bend both of her thumbs down and touch and touch the small metacarpal head[,] which is what I'm doing right now, which is about normal range of motion.[2]  She was able to make a whole fist.  She had an open carpal tunnel scar . . . which was well healed.  There was no evidence of what's called complex regional pain syndrome which is—it can happen in response to an injury, in response to a surgery.  It's when the body continues to have a pain response long after an injury has happened.  There was no evidence of that.  She had no pillar pain which is when you have pain in this area after a carpal tunnel.  Generally that goes away after about three months after the surgery.  Her skin color was normal.  Temperature was normal.  There was no atrophy meaning that muscle hadn't gotten flatt[en]ed in her hand.
>
> The exam for carpal tunnel syndrome was negative.  Exam for compression of the ulnar nerve at [her] elbow was negative.  She did have some tenderness over her pis[i]form bone . . . .  She did have full range of motion of her wrist.

---

[1]  Dr. Zornitzer told the jury there are two sesamoid bones in the thumb that sit in a tendon.

[2]  Plaintiff was able to touch her thumb to her small finger on both hands.

A-0780-22

Dr. Zornitzer summarized his review of plaintiff's medical records. He noted plaintiff complained of pain and bruising to her right hand when seen in the emergency department the day after the accident. X-rays of her hand revealed some arthritis.

Dr. Ende's records of September 13, 2017 reflected "some bruising . . . of [her] right wrist and thumb," and a diagnosis of wrist pain and thumb tenosynovitis, which was treated with injections. The MRI of her right wrist done on September 25, 2017 did not show any fractures or dislocation and "[t]he carpal tunnel looked normal." Dr. Zornitzer explained a person can still have carpal tunnel syndrome despite a normal MRI finding because "[c]arpal tunnel is numbness. . . . An MRI doesn't measure numbness or give history with that regard . . . ." A subsequent MRI scan done on February 15, 2018 reported no significant abnormalities.

In reviewing Dr. Pizzillo's records, Dr. Zornitzer noted plaintiff reported complaints of pain in her lower wrist, constant numbness and tingling, and pain in the joint of her thumb. X-rays of her right thumb were normal. In Dr. Kirschenbaum's 2018 report, he noted plaintiff's complaints of pain in her thumb, numbness and tingling, and a loss of sensation in her hand. The diagnosis was carpal tunnel syndrome, osteoarthritis, and right chronic sprain at

A-0780-22

the thumb. Dr. Zornitzer testified the 2019 "[s]urgery was done to heal the carpal tunnel to release the pulley in both sides, or the radial and p[a]lmar sesamoids at the thumb . . . joint." According to the operative report, Dr. Kirschenbaum found "arthritic change[s] at the radial and ulnar sesamoids" and the findings of the pathologist after a review of the bones was consistent with arthritis.

During cross-examination, Dr. Zornitzer explained Hashimoto's Disease is a disease of the thyroid that can cause swelling and pain in the joints and limbs. He stated that plaintiff had about a one-inch scar in the crease of her thumb from the surgery that was well-healed and not disfiguring or deforming. The scar on her wrist was also healed and non-deformed.

In answering questions about osteophytosis found in the initial x-rays done in the emergency department, Dr. Zornitzer stated it refers to bone spurs that grow around joints such as the thumb. The spurs develop over time as a result of osteoarthritis. The doctor stated the osteoarthritis was present in plaintiff's right hand prior to the accident and the condition can cause discomfort and pain.

Dr. Zornitzer confirmed two sesamoid bones were removed in the surgery. Each bone was less than an inch long. He explained the bones "sit beside the

11

tendon so [they] help[] with the nerve conduction, inflection strength." He agreed that plaintiff had full range of motion in her right hand.

Plaintiff's counsel also read to the jury portions of defendant's deposition testimony during which defendant stated he was driving at a speed of twenty to twenty-five miles per hour and he did not stop at the stop sign controlling his travel through the intersection where the accident occurred.

Dr. Edward Decter testified as defendant's expert witness in orthopedic surgery. He reviewed plaintiff's medical records and performed a physical evaluation on April 20, 2021. He described his examination as follows:

> [Plaintiff] had a well-healed scarification at the base of her thumb. She said her entire right hand was different, as far as light touch to the left hand. She had what's called a negative tinel[ sign]. That's where you tap over the median nerve or the ulnar nerve in the elbow and you see if you reproduce tingling of the nerve.
>
> Her tinel sign was negative at the cubital tunnel syndrome and also at the canal if we go into wrist, and she also had a negative tinel[ sign] over the palm of the hand where the median nerve is, so I checked the ulnar nerve, the median nerve, and the ulnar nerve up at the elbow.
>
> She said that she had subjective weakness of grip of her right hand. She had no weakness when lifting her wrist up to dorsiflexion and there was no evidence of any thenar atrophy. Thenar is the palm of your hand by your thumb, the base of your thumb and when someone has a significant injury to the median nerve

12

where carpal tunnel syndrome is, you get atrophy of
that muscle, and she had no evidence of atrophy of that
muscle.

Dr. Decter stated that "[t]here was no real difference" between the findings

on his examination in 2021 and Dr. Zornitzer's findings in June 2020, other than

Dr. Zornitzer found plaintiff had some weakness in her right-hand grip in 2020

and Dr. Decter reported plaintiff had some "subjective weakness" in her right-

hand grip.  He explained his finding was "subjective" because

there w[ere] no findings of the nerve that go to the hand
that would objectively give you that weakness, so if I
tell you to grip my hand, and you only grip it with a
certain part of your hand, and it's weaker, that's
subjective in my . . . opinion.

Dr. Decter testified that his review of Dr. Kirschenbaum's medical records

and reports "raised in [his] mind questions as to why" Dr. Kirschenbaum

released a certain tendon during the surgery because the tendon was normal.  Dr.

Decter further explained that he and Dr. Zornitzer both noted in their reports

that the EMG—nerve testing—done before the surgery was negative.  Dr. Decter

stated:  "There was no positive EMG before the surgery that confirm[ed]

[plaintiff's] subjective complaints of numbness and tingling in that hand."

Dr. Decter questioned plaintiff's need for the surgery because the tendon

in the thumb was normal.  In addition, he stated the pathology report did not

13

substantiate Dr. Kirschenbaum's diagnosis as it found the bones were normal. He said, "I just question Dr. Kirschenbaum's indication for [plaintiff's] surgery" since plaintiff's "subjective complaints . . . were not substantiated by objective findings."

The doctor stated the arthritic changes described in Dr. Kirschenbaum's operative report did not develop overnight and "[i]n non-weight bearing joints, it would take years." He further testified, "[Y]ou can live without your sesamoid bones. . . . It has no bearing o[n] functionality." Dr. Decter opined there was nothing presented to demonstrate plaintiff would have ongoing problems with using her right hand.

On cross-examination, Dr. Decter confirmed plaintiff had a contusion to her hand as a result of the accident. He also confirmed the pre-operative diagnosis in Dr. Kirschenbaum's report was right carpal tunnel syndrome.

At the close of the evidence, plaintiff moved for a directed verdict on the issue of liability. The trial judge denied the motion, finding the issue was a question for the jury to decide.

During her closing argument, defense counsel made the following comments:

> And I'm pleased to say because [defendant], who unfortunately is not here with us, but because he

14

admitted right at the scene of the accident that he did not see the stop sign, the first question [on the verdict sheet] is already answered for you, because as you heard throughout this trial, [defendant] admitted he didn't see the stop sign so that is negligence. . . .

. . . .

. . . [Plaintiff] told you sitting here under oath, that she could only see this intersection from one car length away from the intersection, but she also told you that the road was straight, there were no hills and that there was nothing obstructing her view. I'd submit to you that testimony alone is sufficient to find that [plaintiff] was not taking the proper degree of concern and observation for her own safety or the safety of a deer, a child or maybe some slow, elderly people driving through. . . .

Plaintiff's attorney did not object to the statements.

The jury returned a verdict in favor of plaintiff, finding defendant was solely liable for the car accident and plaintiff's injuries were a proximate result of the accident, and awarded her $13,000 in damages for her pain, suffering, disability, impairment, and loss of enjoyment of life.

On appeal, plaintiff contends the trial court erred in denying her motion for a new trial on damages and denying her motions for a directed verdict, and defense counsel made up facts that were not supported by the evidence and caused clear error that prejudiced the jury.

15

We begin by addressing plaintiff's contentions of error in the denial of her motion for a new trial.

"The standard of review on appeal from decisions on motions for a new trial is the same as that governing the trial judge—whether there was a miscarriage of justice under the law." Hayes v. Delamotte, 231 N.J. 373, 386 (2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011)); see also R. 4:49-1(a). "[A] 'miscarriage of justice' can arise when there is a 'manifest lack of inherently credible evidence to support the finding,' when there has been an 'obvious overlooking or under-valuation of crucial evidence,' or when the case culminates in 'a clearly unjust result.'" Hayes, 231 N.J. at 386 (quoting Risko, 206 N.J. at 521-22).

In evaluating the trial court's decision to grant or deny a new trial, "an appellate court must give 'due deference' to the trial court's 'feel of the case,'" however, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Ibid. (alteration in original) (first quoting Risko, 206 N.J. at 522; and then quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

16                                                                          A-0780-22

Plaintiff contends the trial judge erred in denying her motion for a new trial on damages because the jury verdict of $13,000 "was against the weight of the evidence and a miscarriage of justice under the law."

A trial court "may not disturb damages awarded by a jury unless it is so grossly excessive or so grossly inadequate 'that it shocks the judicial conscience.' If a damages award meets that standard, then the court must grant a new trial." Orientale v. Jennings, 239 N.J. 569, 595-96 (2019) (citation omitted).[3] The Court emphasized in Orientale "that 'the judge does not sit as a decisive juror and should not overturn a damages award falling within a wide acceptable range—a range that accounts for the fact that different juries might return very different awards even in the same case.'" Id. at 589-90 (quoting Cuevas v. Wentworth Grp., 226 N.J. 480, 486 (2016)).

Although plaintiff alleged injuries and residual complaints to many body parts through her own testimony, she only presented expert testimony regarding the injury and treatment to her right hand and her continuing difficulties using the hand in her daily activities. However, plaintiff's own orthopedic expert did not completely corroborate her complaints. Dr. Zornitzer found plaintiff had

_____

[3] In Orientale, the Court established the procedure that when the trial court offers a remittitur or additur the parties must mutually accept the offer.

full range of motion of her right hand when he examined her in 2020 and the scars on her hand were not deformed or debilitating. Dr. Zornitzer also testified the EMG testing on plaintiff was negative prior to her undergoing surgery, raising questions regarding any nerve damage.

Dr. Decter conceded plaintiff injured her hand in the accident as the records reflected a contusion and some swelling. After reviewing plaintiff's medical records, Dr. Decter told the jury he questioned the need for the surgery to the hand since the EMG testing was negative and the surgeon's operative report stated the tendon was not damaged. In addition, both orthopedic experts agreed plaintiff had pre-existing arthritis in her right hand, which could cause symptoms similar to those experienced by plaintiff.

The jury listened to plaintiff's and the experts' testimony and came to its own conclusions regarding the extent and value of plaintiff's injuries and damages. As the trial judge stated, "[T]he jury is charged with the responsibility of [holding] the plaintiff to [her] burden of proof."

Plaintiff's pain and residual complaints are subjective, and it was the jury's province to consider her demeanor and testimony in its evaluation of damages. But the medical experts' testimony regarding plaintiff's surgery, her physical

18

status at the time of their examinations, and inconsistencies in her testimony were also for the jury to weigh in its determination.

We are given no reason to conclude the jury did not follow the court's instructions and render the award it deemed fair and reasonable. The jury found in plaintiff's favor on liability and found she sustained some level of injury. Under all of the circumstances, the damage award does not shock the conscience to warrant a new trial. The trial judge did not err in denying the motion for a new trial on damages.

We turn next to plaintiff's arguments regarding the court's error in denying her motions for a directed verdict. "Our review of the trial court's evidential rulings 'is limited to examining the decision for abuse of discretion.'" Primmer v. Harrison, 472 N.J. Super. 173, 187 (2022), certif. denied, 253 N.J. 47 (2023) (quoting Ehrlich v. Sorokin, 451 N.J. Super. 119, 128 (App. Div. 2017)).

The first time plaintiff asked the trial court to direct a verdict of liability in her favor it was framed as an in limine motion. The trial court found the application was improperly presented as an in limine motion as it sought an order determining defendant was negligent and solely responsible for the happening of the accident. Instead, the motion was in fact one for summary

judgment—seeking a dispositive determination as to liability for the happening of the accident. We discern no abuse of discretion in the court's ruling.

A motion in limine should be denied if the issue is premature and requires an analysis of evidence that has not yet been presented. Berrie v. Berrie, 252 N.J. Super. 635, 641-42 (App. Div. 1991). Here, although defendant conceded he was negligent, he did not stipulate he was the sole cause of the accident. Defendant was entitled to cross-examine plaintiff as to her version of the accident. The application was improperly presented as an in limine motion and the court appropriately determined it was the jury's province to assess liability for the accident.

Plaintiff renewed her motion for a directed verdict at the close of the case. The court found it remained within the jury's province to determine if plaintiff had any responsibility for the happening of the accident. We agree.

Under Rule 4:40-1, the court must accept as true all of the evidence which supports the position of the party opposing the motion and accord that party the benefit of all favorable inferences. If "reasonable minds could differ, the motion must be denied." Verdicchio v. Ricca, 179 N.J. 1, 30 (2004) (quoting Est. of Roach v. TRW, Inc., 164 N.J 598, 612 (2000)). Through cross-examination,

defendant planted some seeds that might have permitted the jury to find some liability on plaintiff's part.

Notwithstanding, the jury found defendant was 100% liable for the happening of the accident. Therefore, any error was harmless since it cannot be found to have contributed to any mistake in the verdict. State v. Jackson, 243 N.J. 52, 73 (2020).

For the first time, plaintiff argues on appeal that defense counsel "made up facts," unsupported by the evidence, in her closing argument to garner the jury's sympathy. Plaintiff asserts defense counsel's statements prejudiced the jury's verdict.

Plaintiff did not object to the comments when they were made, nor did she raise this argument before the trial court as a basis for a new trial. Therefore, we review the comments for plain error. R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . .").

Plaintiff asserts the comments defense counsel made regarding defendant's age and his acceptance of responsibility for the accident at the scene were not facts presented to the jury. That is true. However, both comments were fleeting. And plaintiff did not find them objectionable when they were

made. See State v. Pressley, 232 N.J. 587, 594 (2018) (citation omitted) (stating there is a presumption against error when counsel fails to make a timely objection, because "it is a sign 'that . . . counsel did not believe the remarks were prejudicial' when they were made"). In addition, the court instructed the jury it was to "decide the case fairly and impartially without sympathy . . . ."

We discern no error in the brief reference to defendant's age as plaintiff has not demonstrated how it could have "clearly . . . produc[ed] an unjust result" regarding the damages award. R. 2:10-2. As to the second comment, defendant stipulated he was negligent, and the jury found defendant was solely responsible for the happening of the accident. Therefore, the comment if error, was harmless.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0780-22