**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0725-21

KATHLEEN VOTOR-JONES,

 Plaintiff-Appellant/
Cross-Respondent,

v.

RIPLE J. HANSALIA, M.D. and
SHORE HEART GROUP,

 Defendants-Respondents/
Cross-Appellants,

and

JERSEY SHORE UNIVERSITY
MEDICAL CENTER,[1]

 Defendant.

Argued October 11, 2023 – Decided August 29, 2024

Before Judges Sumners, Rose and Smith.

---

[1] Jersey Shore University Medical Center was dismissed by agreement of the parties in August 2019, and is not a party to this appeal.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-0972-17.

Christina Vassiliou Harvey argued the cause for appellant/cross-respondent (LoMurro, Munson, Comer, Brown & Schottland, LLC, attorneys; Jonathan H. LoMurro, of counsel; Christina Vassiliou Harvey, of counsel and on the briefs; Andrew Broome, on the briefs).

Tess Jennifer Kline argued the cause for respondents/cross-appellants (Buckley Theroux Kline & Cooley, LLC, attorneys; Tess Jennifer Kline, of counsel; Charles Carver Loughery, on the briefs).

PER CURIAM

Plaintiff Kathleen Votor-Jones appeals from the jury's unanimous no-cause verdict and denial of her motion for a new trial in this medical negligence action against defendants Riple J. Hansalia, M.D., the cardiovascular specialist who performed her subcutaneous defibrillator surgery, and his medical practice, Shore Heart Group. Plaintiff claims four trial errors, singly or cumulatively, deprived her of a fair trial: (1) she was "irreparably prejudiced" by Dr. Hansalia's "surprise testimony"; (2) defense counsel improperly cross-examined her expert "through inadmissible records"; (3) "defense counsel's improper commentary and conduct warrant[ed] a mistrial"; and (4) "defense counsel improperly asked [Dr.] Hansalia leading questions on direct examination and

2

used leading questions to refresh his memory without an adequate foundation." All but the fourth claim were raised in plaintiff's motion for a new trial.

In their cross-appeal, defendants challenge three trial rulings. They assert the court improperly: (1) "prevented the defense from impeaching plaintiff's expert witness with plaintiff's medical records"; (2) "prevented the defense from publishing plaintiff's medical records to the jury"; and (3) overruled defense counsel's objection to certain closing remarks made by plaintiff's counsel.

Having reviewed the limited record provided on appeal,[2] we conclude the case was fairly tried and discern no error warrants overturning the jury's verdict. We therefore affirm the verdict and the October 21, 2021 order denying plaintiff's motion for a new trial. Accordingly, we dismiss as moot defendants' cross-appeal.

---

[2] In her certification in support of plaintiff's motion for a new trial, plaintiff's counsel requested alternative relief, limiting the trial transcripts for appellate review to the full testimony of plaintiff, Dr. Hansalia, and plaintiff's expert in psychology, Sean Evers, Ph.D. See R. 2:5-3(c). In so doing so, the trial court carefully considered plaintiff's application was unopposed and her ensuing appeal would be limited in scope to "three issues": Dr. Hansalia's surprise testimony; plaintiff's cross-examination; and Dr. Evers's cross-examination. On appeal, plaintiff also provided the transcripts of her motions for a mistrial and new trial, the parties' closing arguments, and the court's final instructions to the jury. The parties also provided select portions of written discovery, deposition transcripts, and plaintiff's medical records.

A-0725-21

# I.

## Governing Legal Principles

Well-established principles guide our review. "The standard of review on appeal from decisions on motions for a new trial is the same as that governing the trial judge – whether there was a miscarriage of justice under the law." Risko v. Thompson Muller Auto. Grp. Inc., 206 N.J. 506, 522; see also Hayes v. Delamotte, 231 N.J. 373, 386 (2018); R. 2:10-1. "[A] 'miscarriage of justice' can arise when there is a 'manifest lack of inherently credible evidence to support the finding,' when there has been an 'obvious overlooking or under-valuation of crucial evidence,' or when the case culminates in 'a clearly unjust result.'" Hayes, 231 N.J. at 386 (quoting Risko, 206 N.J. at 521-22).

A "jury verdict is entitled to considerable deference." Risko, 206 N.J. at 521. "On a motion for a new trial, all evidence supporting the verdict must be accepted as true, and all reasonable inferences must be drawn in favor of upholding the verdict." Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005); see also Dutton v. Rando, 458 N.J. Super. 213, 224 (App. Div. 2019). In an appeal of a decision on a motion for a new trial, we must give "due regard to the opportunity of the jury to pass upon the credibility of the witnesses," R. 4:49-1(a), and "'due deference' to the trial court's 'feel of the

case,'" Risko, 206 N.J. at 522 (quoting Jastram v. Kruse, 197 N.J. 216, 230 (2008)); see also Dolson v. Anastasia, 55 N.J. 2, 7 (1969) (recognizing appellate courts must defer to the trial court's views on "witness credibility, 'demeanor,' 'feel of the case,' or other criteria which are not transmitted by the written record").

Similarly, we review evidentiary rulings only for an abuse of discretion. See, e.g., Rowe v. Bell & Gossett Co., 239 N.J. 531, 551 (2019). "This means that a trial court is granted broad discretion to determine both the relevance of the evidence presented and whether its probative value is substantially outweighed by its prejudicial nature." Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (citing Wymbs v. Township of Wayne, 163 N.J. 523, 537 (2000)). Thus, a reviewing court "will reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Griffin v. City of East Orange, 225 N.J. 400, 413 (2016) (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

II.

Factual Background and Procedural History

The case was tried over several days in late July and early August 2021. Both parties testified and presented expert testimony. Plaintiff also called three

of her five children to testify on her behalf, and defendants called their private investigator. Numerous exhibits were admitted in evidence. We limit our summary of the evidence adduced at trial to plaintiff's trial error claims.

Plaintiff's history of health problems was a central issue in this case in view of her expert's opinion that she suffered from post-traumatic stress and adjustment disorders as a result of the surgery performed by Dr. Hansalia. For purposes of this appeal, however, we need not detail that history. Suffice it to say, plaintiff suffered physical and emotional abuse as a child; underwent a procedure during childbirth that caused permanent injuries; was involved in a motor vehicle accident that caused whiplash and broken teeth; and was involved in a jet ski accident that caused several injuries, including a broken wrist, foot, and back.

In 2012, at age forty-five, plaintiff suffered a myocardial infraction, a severe heart attack known as a "widow maker," and had two stents implanted. The following year, plaintiff underwent surgery to install an intravenous defibrillator to protect against sudden cardiac arrest. Inserted in plaintiff's chest, the device was connected to the heart muscle via a wire that ran through her vein. The device was designed to send a "therapeutic shock to the heart" if necessary.

6

On July 18, 2015, plaintiff was hospitalized at Jersey Shore University Medical Center (JSUMC) after the device's wire broke and activated her defibrillator's alarm. Two days later, while hospitalized, she met Dr. Hansalia. At trial, Dr. Hansalia testified plaintiff was upset that her defibrillator had failed and inquired about alternative technology. During his daily visits between July 20 and July 24, Dr. Hansalia explained to plaintiff the various options, and their risks and benefits. Those options included the removal of plaintiff's intravenous defibrillator and installation of a new subcutaneous defibrillator. Dr. Hansalia told plaintiff the risks surrounding the device included "bleeding, scar[ring], infection, pain, chronic pain, stroke, heart attack, blood clot, air around the lung, blood around the heart if there was a tear," and the risk of death. Plaintiff opted to undergo the procedure during Dr. Hansalia's July 21 consultation.

Dr. Hansalia testified he generally informed patients that installation of the subcutaneous device required three incisions. He typically informed his patients about the device's size because it was larger and more prominent than a traditional device. Because the device was located "at the side of the chest, lower down," Dr. Hansalia advised his patients it might "take[] longer to get used to." He further asserted it was "impossible to predict" the extent to which the device would protrude because "the skin and subcutaneous tissues are a

7

variable thickness from person-to-person," which did not necessarily correlate to body type or size.

Conversely, plaintiff testified she thought the subcutaneous device would be placed "under [her] armpit," and that the device "would slide in and that then the wire would go around the heart." Plaintiff claimed Dr. Hansalia said she would have "no limitations" with the device and it would be "better" than her old intravenous defibrillator, which she described as "very comfortable." Further, Dr. Hansalia "[v]aguely" went over the risks and benefits of the subcutaneous defibrillator. On cross-examination, however, plaintiff acknowledged Dr. Hansalia apprised her of the risks he testified about.

But plaintiff testified that upon awakening from surgery, she noticed her "breast had been severed in the center and there was a giant protrusion from the device on [her] rib cage." She claimed this result was not one of the risks that Dr. Hansalia had explained. She also noticed a "blue marker line" under her arm, which was depicted in a photograph admitted in evidence. She said she was "horrified . . . extremely upset, and very depressed" about the way in which the device was inserted.

Plaintiff further claimed Dr. Hansalia did not advise her of the adverse consequences she experienced post-surgery, including "excruciating pain" near

8

her rib cage.  Plaintiff was unable to breathe without pain or sit or lie in certain positions "because the box was enormous."  Nor could she perform her daily activities, such as dressing and showering.  Her sleep was interrupted.  She could not hold her grandchild.  Plaintiff told the jury the surgery impacted her self-esteem, body image, and social life.  Had Dr. Hansalia apprised her of these risks, plaintiff would not have consented to the surgery.

Yet plaintiff acknowledged she went to the beach, went swimming, wore a bathing suit, wore a sun dress, took care of her granddaughter, went out to dinner, and went on vacation.  She clarified that she still left her home and engaged in activities, but she no longer "enjoy[ed] going out in public," and felt "self-conscious."  She also claimed after activities such as caring for her granddaughter, she would "pay for it later" by experiencing pain.

Following her discharge from the hospital, plaintiff had difficulty scheduling an appointment with Dr. Hansalia.  She had four post-operative appointments at Dr. Hansalia's office.  Accompanied by a friend, plaintiff met with Dr. Hansalia during her third appointment.  Her friend surreptitiously recorded the appointment because plaintiff no longer trusted Dr. Hansalia.  The recording was admitted in evidence and played for the jury at trial.  During the appointment, plaintiff advised Dr. Hansalia of her physical complaints.  Dr.

9

Hansalia explained, as with all devices, there was a risk of chronic pain from the installation of this device. He also discussed the option of removing the subcutaneous device and reinserting an intravenous device.

At plaintiff's request, approximately four months after the first surgery, Dr. Hansalia replaced the subcutaneous defibrillator with another intravenous defibrillator. On two occasions thereafter, the intravenous defibrillator experienced wire fractures. Plaintiff had surgery to reattach the first fracture, but following the second fracture she had the device turned off.

Eventually, plaintiff had the device and wire removed. She filed the present action in March 2017, alleging Dr. Hansalia negligently: (1) breached the standard of care by placing the subcutaneous defibrillator too far forward on her body, causing her physical and psychological injury; (2) cut through her breast during the procedure, causing her physical and psychological injury; and (3) failed to obtain her informed consent for the procedure.

III.

Dr. Hansalia's "Surprise Testimony"

Dr. Hansalia testified that during the pre-operative process, plaintiff was placed on the operating room table and her body was marked for "the expected incision locations." During that process, "typically" a nurse "pull[ed] the breast

up out of the way," and Dr. Hansalia marked the patient's body where the incision would be made to insert the subcutaneous device, which "would be adjacent to the heart." He explained: "Typically, that area is in the inframammary crease," which "separates breast tissue from muscle." But "the actual incision may be above or below that area." Dr. Hansalia stated the device must be inserted in the mid-axillary position, which is a region of the armpit. Although the marking process "changed a little bit over time," in 2015, the markings were made pursuant to "the expected position of the subcutaneous [defibrillator]."

After plaintiff's body was marked, she was sedated, the region was sterilized, and she was wrapped with Ioban, a "mildly opaque" film similar to "Saran wrap." Because the wrapping process can change the position of the breasts, Dr. Hansalia reevaluated the markings to determine whether the incision would permit placement of the device in the precise location. Dr. Hansalia elaborated that a subcutaneous defibrillator must be placed "next to the heart" and "in the mid-axillary position," otherwise the device would be rendered "useless."

For the first time at trial, Dr. Hansalia stated the original marking point, which was visible in the post-operative photograph submitted in evidence by

A-0725-21

plaintiff, was not "appropriate" because insertion of the device at that location would have resulted in "place[ment] too posteriorly or too towards the back." As such, the device would not have functioned properly. Accordingly, Dr. Hansalia deviated from the expected incision so he could "place the device in the mid-axillary position." To do so, he made an incision "at the very bottom portion of [plaintiff's] breast."

Plaintiff's counsel objected to this testimony, arguing Dr. Hansalia never mentioned during the lengthy course of discovery that he "switched the position of the placement of th[e] incision." The court overruled the objection, reasoning plaintiff's counsel could cross-examine Dr. Hansalia as to why this information was not included in his operative report or otherwise revealed during discovery.

Direct examination continued. In response to why he had not previously referenced the revised incision point, Dr. Hansalia testified: "It's just not something that I normally do. Because part of the process is to make the incision where I need to put the device for it to work." Accordingly, he revised the "expected incision" point so he could "place the device in the mid-axillary position." Dr. Hansalia explained this modification was correct because the X-ray photograph confirmed the proper placement and the device functioned properly.

A-0725-21

On cross-examination, Dr. Hansalia acknowledged that at deposition, he stated ordinarily he does not "go through the breast at all." Instead, he testified that he inserts the device through "the left chest area." But he further explained at trial that incisions will vary and it was impossible to state where the exact position of an incision would be made. Although Dr. Hansalia had discontinued surgeries if he felt the procedure exceeded the patient's consent, he did not stop this surgery because he had discussed with plaintiff the possibility of making an incision to her breast. After inserting the defibrillator, Dr. Hansalia performed testing and confirmed the device "worked perfectly."

Dr. Hansalia also acknowledged he did not mention the modified incision point during discovery because he had not recalled the change until "immediately" prior to trial when he reviewed plaintiff's post-operative photographs with his lawyer. Following his response, at sidebar, plaintiff's counsel moved for a mistrial citing our Supreme Court's decision in McKenney v. Jersey City Medical Center, 167 N.J. 359 (2001) (recognizing when "an attorney knows that his client or a material witness intends to deviate from his deposition testimony in a crucial way, . . . the attorney has an ethical obligation to convey that fact to his adversary"). In essence, plaintiff argued defense

counsel was obligated to disclose the change in Dr. Hansalia's testimony before trial.

After colloquy with counsel, the court denied plaintiff's application, noting it was "not surprised by the testimony" based on its recollection of the testimony. But the court granted plaintiff's request for an immediate limiting instruction, informing the jury "under New Jersey Law all parties are required to amend discovery responses where appropriate."

Following the jury's verdict, plaintiff moved for a new trial. During argument on this point, plaintiff's counsel claimed Dr. Hansalia's "new revelation" concerning the revised incision location prejudiced plaintiff's case because she did not have an opportunity to challenge the testimony through expert evidence. In her certification in support of the motion, plaintiff's counsel averred "had she known that [Dr. Hansalia] contended the drawn line on [plaintiff's photograph] constituted where [Dr.] Hansalia intended to make the incision, she could have sought an opinion from her expert[, Nil Guttenplan, M.D.,] that the line constituted a breach of the standard of care."

The trial court denied the motion. Incorporating its prior rulings, the court remained unconvinced that Dr. Hansalia's testimony contravened our Supreme Court's decision in McKenney. The court found Dr. Hansalia "explained his

14

opinion, his opinion was consistent throughout concerning the body habitus of . . . plaintiff, [and] how he decided to make his location." The court also noted plaintiff's theory throughout trial was the location at which "[Dr. Hansalia] decided to install the implant" was incorrect.

On appeal, plaintiff argues Dr. Hansalia's "surprise testimony" threatened "fundamental principles of fairness underlying the discovery process." Contending the primary dispute at trial was "whether [Dr.] Hansalia breached the standard of care in making the incision into [p]laintiff's breast or warned he would cut her breast," plaintiff maintains Dr. Hansalia's testimony, presented after the close of her case, restricted her ability to prepare for the issue and refute his claim through her own expert evidence. Plaintiff thus contends Dr. Hansalia and his attorney "engaged in trial by ambush."

In McKenney, the plaintiffs sued the medical center and several staff members involved in the birth of their child who was afflicted with spina bifida. 167 N.J. at 364. The plaintiffs argued the medical center and its staff failed to inform them of their child's condition, claiming such information should have been seen on sonograms prior to the time an abortion could have been performed lawfully. Ibid.

15

In his deposition, the defendant doctor acknowledged viewing the scans well in advance of the child's birth. Id. at 366. However, at trial, he changed his testimony, stating that upon review of the hospital's sonogram logbook, which plaintiffs' counsel had unsuccessfully sought during discovery, he determined he probably did not review the sonogram until weeks later after an abortion was no longer a legal option. Id. at 366-67. Another witness, a certified ultrasound sonographer, who had been dismissed as a defendant from the case prior to trial, also changed her testimony during trial from what she initially stated in her deposition. Id. at 367. It was later revealed defense counsel learned of the change in testimony the night before trial and failed to notify plaintiffs' counsel. Id. at 369.

The Court held "defense counsel had a continuing obligation to disclose to the trial court and counsel for plaintiffs any anticipated material changes in a defendant's or a material witness's deposition testimony." Id. at 371. Such a rule was consistent with the principles of fairness surrounding the obligation of candor between adversaries in the legal system. Ibid.

In the present matter, the issue raised by plaintiff fails to demonstrate a McKenney violation warranting reversal. The purpose underlying the Court's ruling in McKenney was to require attorneys to notify their adversaries of new,

A-0725-21

materially relevant information that is distinguishable from the witness's pretrial statements. Id. at 370. Although the better course would have been for defense counsel to have disclosed Dr. Hansalia's late recollection that he modified the incision point, based on our review of the record provided on appeal, we conclude this omission was not material.

Indeed, similar to the trial court, we are not persuaded Dr. Hansalia's late disclosure about the pre-incision marker prejudiced plaintiff's theory of the case. In McKenney, the surprise testimony was prejudicial precisely because it was directly linked to the underlying cause of action—the timing of the review of the ultrasound was determinative as to whether it impacted the plaintiffs' ability to terminate the pregnancy, and the sonographer's testimony shifted liability away from the doctor, and back to the sonographer, who had already been dismissed as defendant from the case. Id. at 372-74; see also T.L. v. Goldberg, 238 N.J. 218, 221-22 (2019) (distinguishing "[t]he circumstances at issue in McKenney, which heavily depended on the prejudice caused to the party disadvantaged by the surprise change in trial testimony").

By contrast, plaintiff generally argues the timing of the testimony precluded her from presenting expert testimony on this issue, specifically Dr. Guttenplan's opinion that the pre-incision marker was incorrectly placed.

However, placement of the pre-incision marker was undisputed, Dr. Hansalia having acknowledged as much at trial. Plaintiff fails to articulate how Dr. Guttenplan's testimony would have impacted her argument concerning breach of the standard of care. Stated another way, had Dr. Guttenplan opined that the original marking was correct, he would have contradicted Dr. Hansalia's new testimony and supported her standard of care claim. But plaintiff does not offer a specific theory as to how Hansalia's new testimony disadvantaged her.

Moreover, during pretrial discovery, Dr. Hansalia revealed the location of the incision for the device is determined by the location of the patient's heart. For example, in his answer to plaintiff's supplemental interrogatory, "[w]hy did you make the incisions at the locations you chose when implanting the subcutaneous [defibrillator]," Dr. Hansalia responded, in pertinent part: "The [unit] is placed in the left lateral chest area. The incision is determined by the location of the heart based on the patient's body habitus." Further, when questioned at his first deposition about the incision site for the defibrillator and how he determined placement, Dr. Hansalia responded: "Typically we look where the heart is located based on where . . . the patient's body habit[us] is. So, we are really looking to the left lateral chest area." And during his second deposition when asked whether he "agree[d] that the procedure requires that [he]

18

make an incision along the inframammary crease," Dr. Hansalia stated, "[t]he incision can be made in a variety of locations."

Even assuming defense counsel should have disclosed Dr. Hansalia's late revelation about the location of the marker, we discern no error in the court's implicit finding that plaintiff was not prejudiced by the testimony here. We conclude, as did the trial court, plaintiff failed to demonstrate "a miscarriage of justice under the law." R. 2:10-1.

IV.

Defense Counsel's Cross-Examination of Plaintiff's Expert

Plaintiff contends the trial court abused its discretion by permitting defense counsel to cross-examine her expert in psychology with documents he had never seen, were not admitted in evidence, and which contained inadmissible hearsay. Plaintiff objected to the questioning at trial, moved for a mistrial at the conclusion of her expert's testimony, and raised the issue in her motion for a new trial. In essence, plaintiff maintains defense counsel's purpose was not to impeach her expert, but to "taint the jury's perception of [her]."

To lend context to the objections posed, we begin by noting, as did the trial court, the main issue in this case was "plaintiff's psychological well-being, her history, and how she was coping with events." On direct examination,

19

plaintiff's expert in psychology, Sean Evers, Ph.D., explained his diagnosis of plaintiff was based on the results of his testing and clinical interview. Dr. Evers elaborated:

> She responded to a series of questions and described a series of events that qualified as some kind of unusual trauma. In this case, the medical trauma. She talked about thinking about it often, thinking about it when she doesn't want to think about it, having dreams about it at different points.
>
> She described avoidance behaviors: not going places, not doing things that she would normally do. She avoided, at one point, she described avoiding looking in the mirror at herself because she didn't like the way she looked after the surgery. Her attitude was negative, her mood was depressed and she showed kind of a racket push of speech when she talked. It wasn't a smooth conversation, it was somewhat – it was kind of impulsive. That disturbance of arousal, which is the fifth symptom in the symptom cluster of post-traumatic stress.

During cross-examination, Dr. Evers acknowledged he had only reviewed "sixteen pages of records from [JSUMC] that included three pages relating to a cardiology consult report, six pages relating to Dr. Hansalia's pacemaker procedures on July 24[], 2015 and six pages relating to Dr. Hansalia's pacemaker procedure on November 3[], 2015." Following defense counsel's inquiry concerning the pain medications prescribed to plaintiff "[a]s of 2011," that is, four years before the surgery, plaintiff's attorney noted Dr. Evers had not read

20

her prior medical records. Although the ensuing sidebar conversation was indiscernible, the trial court thereafter heard the parties' contentions at length after excusing the jury. Plaintiff's counsel acknowledged her office had sent plaintiff's prior medical records to the defense, but argued the records were not certified, would not be moved into evidence in plaintiff's case-in-chief, and contained "hearsay upon hearsay."

Confirming defense counsel sought to impeach Dr. Evers's testimony with the medical records, the court ruled: "To the extent that prior complaints of pain and discomfort existed, that is certainly relevant to his ultimate opinion in this matter." Further, "the fact that [Dr. Evers] was not aware [and] the fact that th[e records were] not disclosed" were fodder for defense counsel's cross-examination of Dr. Evers. To support its conclusion, the court cited Dr. Evers's opinion that plaintiff's post-operative complaints were caused by Dr. Hansalia's negligence and prior to the surgery "her life was manageable, she was fine; she didn't have any problems." However, the court prohibited counsel from publishing plaintiff's prior medical records to the jury.

Later during cross-examination, Dr. Evers acknowledged he was not aware plaintiff was hospitalized at JSUMC in May 2010 for chest pain, arm numbness, and difficulty breathing. Defense counsel then asked whether Dr.

21

Evers was aware that plaintiff "walked out of the hospital against medical advice." Plaintiff's counsel objected and following a sidebar, which was "indiscernible" and not transcribed, defense counsel rephrased her inquiry with four successive hypothetical questions[3]:

> [DEFENSE COUNSEL:] Doctor, if the patient in May of 2010, if hypothetically she was admitted to the hospital at [JSUMC] for chest pain, her left arm feeling numb and breathing and was admitted and then left against medical advice, would you agree that that is an example of impulsive behavior?
>
> [DR. EVERS:] That could be an example of impulsive behavior.
>
> [DEFENSE COUNSEL:] And if hypothetically, Ms. Votor-Jones went to [JSUMC] on April 16[], 2012 and was admitted for chest pain and numbness of her left arm and then was screaming at the nursing staff, hypothetically, and claiming that no one came to see her even though they were in her room frequently for the other patient and she never spoke up, is that an example of impulsive behavior?
>
> [DR. EVERS:] That could be an example of impulsive behavior.
>
> .   .   .   .
>
> [DEFENSE COUNSEL:] Doctor, if hypothetically the patient was in the hospital on April 17[], 2012 and left the hospital against medical advice, is that an example

_____

[3] In their appellate briefs, the parties acknowledge the court instructed defense counsel to pose questions in the form of hypothetical questions.

of impulsive behavior?

[DR. EVERS:] As I answered before, it could be.

[DEFENSE COUNSEL:] And if it was a different date, that she left against medical advice more than once, are those both examples that could be considered impulsive behavior?

[DR. EVERS:] They could be or – we don't know what other factors that were going on at the time that might explain it.

The following day, plaintiff moved for a mistrial based on defense counsel's "techniques" during cross-examination of Dr. Evers. In essence, plaintiff's counsel argued witnesses cannot be cross-examined about documents they have not seen prior to trial and records that have not been admitted in evidence.

The court denied the motion, finding the records bore upon the expert's credibility. The court reasoned "you cannot isolate an expert by not giving records of [plaintiff's] prior complaints." Referencing Dr. Evers's testimony, the court noted "plaintiff underscored certain events and historical things in her life leading up to [her] treatment with Dr. Hansalia in this matter." Thus, "facts, issues, [and] her prior treatment prior to the [surgery]" were "certainly fair game" for cross-examination of her expert. In its decision on plaintiff's ensuing motion for a new trial, the court found defense counsel's inquiry did not violate

23

our decisions in <u>Morales-Hurtado v. Reinoso</u>, 457 N.J. Super. 170 (App. Div. 2018), <u>aff'd o.b.</u>, 241 N.J. 590 (2020), and <u>James v. Ruiz</u>, 440 N.J. Super. 45 (App. Div. 2015).

On appeal, plaintiff reprises the same arguments rejected by the trial court, focusing on the hypothetical questions posed by defense counsel concerning plaintiff's "impulsive behaviors" purportedly exhibited during her prior hospital admissions in May 2010 and April 2012. Having considered plaintiff's contentions in view of the context in which cross-examination was conducted and the applicable law, we discern no reason to disturb the trial court's evidentiary decision.

Initially, plaintiff's continued reliance on <u>Morales-Hurtado</u> is misplaced. The multiple errors and improprieties identified in <u>Morales-Hurtado</u> were of a different nature and had an overall cumulative effect of depriving the plaintiff of a fair trial. 457 N.J. Super. at 191-99. Unlike the plaintiff's attorney in <u>Morales-Hurtado</u>, plaintiff's counsel in the present matter were skilled advocates, who effectively countered defense counsel's tactics and were not prejudiced in their ability to present plaintiff's claims to the jury. That the jury ultimately did not accept plaintiff's position was not due to defense counsel's tactic. Rather, as the trial court noted, plaintiff's credibility and prior health

history were central issues at trial because Dr. Evers opined she suffered from post-traumatic stress and adjustment disorders following Dr. Hansalia's surgery.

Nor are we persuaded our decision in James compels a different result. In James, the central issue involved an expert's review of a radiology report that was not admitted in evidence and the radiologist did not testify at trial. 440 N.J. Super. at 54-55. On one hand, we recognized an expert may be cross-examined with such records "to show that the defense expert's review of the patient's records was skewed or incomplete," as this "would amount to simply impeachment of the defense expert's credibility, an attack that does not hinge upon the actual truth of the absent declarant's statements." Id. at 75. We added that this form of impeachment was appropriate, as it could "expose the weaknesses of an expert's testimony," and thus could "assist in the search for the truth, one of the recognized goals of our law of evidence." Ibid.

"On the other hand," however, we reiterated "as a general if not immutable proposition, that '[i]t is improper to cross-examine a witness about inadmissible hearsay documents upon which the expert has not relied in forming his opinion.'" Id. at 76 (alteration in original) (quoting Corcoran v. Sears Roebuck & Co., 312 N.J. Super. 117, 130 (App. Div. 1998)). We added "the probative value of such a line of impeachment must be carefully weighed against the very realistic

potential for juror confusion, undue prejudice, and other countervailing considerations under N.J.R.E. 403," particularly where the absent expert's opinion is not in evidence. Ibid.

In the present matter, the trial court echoed some of the concerns we raised in James, 440 N.J. at 75-77, noting plaintiff could not "isolate" her witness and defendants were permitted to demonstrate the limitations of Dr. Evers's evaluation. Dr. Evers did not testify about the conclusions reached by a non-testifying witness, as was the case in James. Instead, as the court found, the information contained in plaintiff's prior medical records was relevant as it bore on Dr. Evers's opinion that plaintiff's impulsive behaviors manifested after Dr. Hansalia's surgery. Moreover, the court apparently attempted to minimize the hearsay issue by requiring counsel to question Dr. Evers via hypothetical questions.

We recognize, however, our Supreme Court has held: "The use of hypothetical questions in the presentation of expert testimony is permitted by N.J.R.E. 705, provided that the questions include facts admitted or supported by the evidence." Townsend v. Pierre, 221 N.J. 36, 58 (2015) (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 4 on N.J.R.E. 705 (2014)). Here, plaintiff's prior medical records were not admitted in evidence.

A-0725-21

Nor did defense counsel question plaintiff about her prior impulsive behaviors. Accordingly, because the hypothetical questions included specific incidents that were not introduced in evidence, they likely exceeded the bounds of permissible inquiry.

However, we conclude any error was not "clearly capable of producing an unjust result" and, as such, we discern no reason to disturb the judgment. Manata v. Pereira, 436 N.J. Super. 330, 343-44 (App. Div. 2014) (quoting Green, 160 N.J. at 502). As the court noted, evidence was adduced at trial undermining plaintiff's allegations that she suffered harm following the surgery. That evidence included surveillance photographs and videos showing her socializing, wearing revealing clothing, laying on her stomach, and picking up her granddaughter. Moreover, the court described plaintiff's demeanor as "evasive" and "argumentative." Accordingly, on this record, we are not convinced defense counsel's reference to plaintiff's prior incidents, alone, could have constituted an unjust result, when there was significant other evidence undermining her credibility. Rather, as the court found, the hypothetical questions challenged Dr. Evers's credibility.

V.

Defense Counsel's Conduct At Trial

As another basis of her motion for a new trial, plaintiff alleged she was harmed by defense counsel's cross-examination of plaintiff and improper commentary. That conduct included: "offer[ing] testimony in the guise of a question," which "implied . . . plaintiff was lying"; "non-verbal commentary in response to [a] question, 'Mmm-Hmm'"; and stating, "the proofs will be what the proofs will be." In its decision on the motion, the court rejected plaintiff's contentions. Recalling the multitude of sidebar arguments, the court "was unaware of any lengthy speaking objection that would arise to the level of the violations that occurred in Morales-Hurtado, nor were there any direct attempts by [defense counsel] to impugn the plaintiff in the matter that violated Morales-Hurtado."

Plaintiff renews her argument that defense counsel engaged in a wide range of impermissible behavior during trial, which adversely impacted plaintiff's credibility and deprived her of a fair trial. As one notable example, plaintiff claims defense counsel improperly elicited testimony from Dr. Hansalia that during their first meeting plaintiff "expressed interest that she wanted to sue somebody." Plaintiff's counsel immediately moved for a mistrial and sanctions,

arguing the answer was improper because it painted plaintiff "as somebody who is litigious."

The court denied the motion but struck the comment from the record and immediately issued the following curative instruction:

> Members of the jury I am going to instruct you that I am striking the last question and answer that were presented to the doctor. What does that mean? And I will explain this to you in my charge, please do not consider even though you may remember that answer, I'm striking that from evidence, so that's something that you should not consider during your deliberations. I will explain that to you in greater detail when I give you the charge. But you should not consider the last question and answer that were provided by the defendant doctor.

During its final charge, the court again instructed the jury that it was not to consider any testimony that was stricken from the record. "We presume the jury followed the court's instructions." State v. Smith, 212 N.J. 365, 409 (2012).

Plaintiff further challenges other commentary, including defense counsel improperly asserted her personal knowledge of the facts. She also objects to certain instances during which documents were published to the jury: without seeking court's permission; before plaintiff's counsel had an opportunity to object; and when the documents were never admitted in evidence. We have considered the breadth of plaintiff's arguments in view of the record provided

on appeal and conclude they lack sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E), beyond the brief remarks that follow.

"There is nothing inherently improper in the use of demonstrative or illustrative evidence." Rodd v. Raritan Radiologic Assocs., P.A., 373 N.J. Super. 154, 164 (App. Div. 2004). Demonstrative evidence can include visual aids to "illustrate [a witness's] testimony and facilitate jury understanding." Macaluso v. Pleskin, 329 N.J. Super. 346, 350 (App. Div. 2000). "In general, the trial court enjoys wide latitude in admitting or rejecting such replicas, illustrations and demonstrations and in controlling the manner of presentation and whether or not particular items are merely exhibited in court or actually received in evidence." Rodd, 373 N.J. at 165.

Here, the information published to the jury were portions of Dr. Evers's report which counsel then read aloud and asked Dr. Evers to confirm as correct. Thus, the documents were not presenting new information, but were merely used as a visual aid to facilitate questioning. Because the information published to the jury also was appropriately presented to the jury through counsel's questioning of Dr. Evers, it is unclear what harm, if any, this conduct had on plaintiff's case. As to plaintiff's second point – that certain documents were published before she had an opportunity to object – plaintiff also did not object

after the documents were published, in an attempt to have them taken down. Based on our review of the record provided on appeal, we discern no reason to disturb the court's decision.

## VI.

Defense Counsel's Direct Examination of Dr. Hansalia

Little need be said regarding plaintiff's contention that defense counsel improperly conducted her examination of Dr. Hansalia over her objections. Plaintiff argues defense counsel asked Dr. Hansalia leading questions and refreshed his recollection with Shore Heart Group's phone summary "even though [Dr.] Hansalia did not provide a basis for his memory to be refreshed." As defendants note, plaintiff's claims were not raised in her motion for a new trial. However, she objected at trial and her motion to limit the transcripts of trial specifically included Dr. Hansalia's testimony.

In any event, plaintiff claims her attorney "continually objected" to defense counsel's leading questions but cites only two for our consideration. As to the first objection, plaintiff cites the following question: "And . . . was aspirin continued throughout the patient's care in the hospital?" Defense counsel heeded the court's ensuing instruction to rephrase the question.

31

Plaintiff also cites her attorney's objection to the question: "What did you discuss with regard to incisions as far as taking out the subcutaneous device and putting in – ." Asserting defense counsel asked leading questions "all throughout th[e] trial," plaintiff's counsel raised the objection at this point because the doctor "didn't say anything on that date" and plaintiff's counsel wanted to be sure defense counsel did not provide the answer in her questions going forward. Recognizing "there's always some leading in every direct examination," the court found the question was "foundational" and "ke[pt] the trial moving." But the court noted it would entertain objections if leading questions were posed for "a substantive area."

The document in question was a page from Shore Heart Group's records that was not admitted in evidence. The document included two notes about phone calls: one summarized a message from plaintiff, requesting to meet with Dr. Hansalia; the other summarized Dr. Hansalia's return call to plaintiff, notating plaintiff stated she had not seen a cardiologist in six months.

The court permitted Dr. Hansalia to review the document. Importantly, however, the court denied defense counsel's application to admit the document into evidence. See N.J.R.E. 612; see also Lautek Corp. v. Image Bus. Sys. Corp., 276 N.J. Super. 531, 545 (App. Div. 1994). Although, as plaintiff correctly

observes, the doctor did not indicate he was unable to recall the document's contents, see State v. Williams, 226 N.J. Super. 94, 103 (App. Div. 1988), he confirmed the document refreshed his recollection, see State v. Caraballo, 330 N.J. Super. 545, 557 (App. Div. 2000).

Having considered the court's rulings pursuant to our deferential standard of review, see Rowe, 239 N.J. at 551, we find insufficient merit in plaintiff's claims of error to warrant further discussion in a written opinion, R. 2:11-3(e)(1)(E). We simply add plaintiff failed to demonstrate she was prejudiced by the leading questions or Dr. Hansalia's testimony after his memory was refreshed with his medical practice's phone records. Rather, Dr. Hansalia's testimony somewhat bolstered plaintiff's testimony that she had difficulty making a follow-up appointment with the doctor.

VII.

Cumulative Errors

Finally, plaintiff argues the cumulative effect of the trial court's alleged errors warrants a retrial. "An appellate court may reverse a trial court's judgment if 'the cumulative effect of small errors [is] so great as to work prejudice,'" rendering the trial unfair. Torres v. Pabon, 225 N.J. 167, 190 (2016) (first alteration in original) (quoting Pellicer ex rel. Pellicer v. St. Barnabas Hosp.,

200 N.J. 22, 53 (2009)). This theory will not apply "where no error was prejudicial and the trial was fair." State v. Weaver, 219 N.J. 131, 155 (2014).

In view of these principles, we reject plaintiff's contention that the cumulative effect of the errors committed during her trial warrants reversal. Plaintiff has failed to demonstrate any error or pattern of errors, rising to the level, either singly or cumulatively, that denied her a fair trial. Plaintiff "is entitled to a fair trial but not a perfect one." State v. R.B., 183 N.J. 308, 334 (2005) (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)).

Moreover, in its decision denying plaintiff's motion for a new trial, the trial court found plaintiff failed to satisfy the "high threshold of constituting clear and convincing evidence that there was a miscarriage of justice under the law." Noting "credibility was at issue throughout this entire case," the court found plaintiff's believability "was significantly questioned throughout this trial." For example, the court found plaintiff's testimony about the "various limitations" on her lifestyle following "the alleged negligence of Dr. Hansalia" was contradicted by defendants' surveillance evidence. Further, plaintiff appeared "reluctant to answer questions, evasive, [and] argumentative." Similar to the trial court, we discern no basis to disturb the jury's unanimous verdict in this case.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0725-21