**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3823-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

EVERETT E. MOORE,

    Defendant-Appellant.

_____

Submitted April 1, 2025 – Decided July 9, 2025

Before Judges Susswein and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 18-07-0598.

Wayne Powell Attorney, PC, attorney for appellant (Wayne Powell, of counsel and on the brief).

Elizabeth Vogelsong-Parvin, Acting Gloucester County Prosecutor, attorney for respondent (Michael C. Mellon, Special Deputy Attorney General/Acting Assistant Prosecutor, on the brief).

PER CURIAM

Defendant Everett E. Moore appeals his jury trial conviction for aggravated manslaughter. This case arises from a road rage incident during a snowstorm where defendant exited his truck and slashed the victim's face with a knife. Responding emergency medical technicians (EMT) worked to address the victim's wounds for the better part of an hour. The victim suffered cardiac arrest before he was transported to a hospital and later died when he was taken off life support.

The jury acquitted defendant of knowing/purposeful murder but found him guilty of the lesser-included offense of aggravated manslaughter along with related weapons charges. Defendant contends for the first time on appeal that the trial court erred in instructing the jury on the law regarding causation. Defendant also contends the trial court erred by not declaring a mistrial when one of the State's experts on palm print analysis failed to abide by the court's ruling limiting her testimony. Finally, he contends the judge who replaced the trial judge[1] erred by not setting aside the verdict as against the weight of the evidence. After reviewing the record in light of the parties' arguments and the governing legal principles, we affirm.

---

[1] The judge who presided over the trial had since retired.

A-3823-22

We discern the following pertinent facts and procedural history from the record. On March 7, 2018, defendant drove past the victim's vehicle during a snowstorm. The victim raised his middle-finger at defendant, prompting defendant to stop, exit his truck and walk to the victim's vehicle. Defendant grabbed the victim through the front window and slashed his face with a knife.

The victim sought help at two nearby homes. One of the homeowners called 9-1-1. Police responded within roughly five to ten minutes after receiving the 4:20 p.m. dispatch. Deptford Township Police Department (DTPD) Officer Thomas Warrington testified that the victim described the assailant as "a black male in his [forties]. He was wearing blue jeans and, I believe, a gray vest." The victim described the assailant's vehicle as "a white colored Kin[g] Ranch style pick-up truck with, like, a cream border."

One of the EMTs testified the weather was "snowy" and there was ice on the roads, delaying their arrival. The victim was bleeding and there was a significant amount of blood around him. The victim had a laceration on his face from his nose across his cheek to his left ear.

The victim was pale, sweaty, and having difficulty speaking. They determined he was at risk of aspirating and needed to be intubated. Due to bad

3

road conditions and complications with his airways, they determined the intubation should occur on scene. The paramedics made two attempts before successfully intubating him because they were unable to see in the victim's airway due to the constant flow of blood. They also administered medication to clot the blood.

Around 5:00 p.m., the victim went into cardiac arrest. The paramedics began working to stabilize and resuscitate him. During their attempts, the victim started bleeding again.

At 5:14 p.m., they transported the victim to a hospital located three miles away. In all, the paramedics had remained on the scene with the victim for forty-one minutes before taking him to the hospital. Though he was alive when he arrived, the victim ultimately succumbed to his injuries.

The medical examiner testified that the victim's death was caused by "an incised wound to the face, a cut wound." The medical examiner explained:

> A[:] Well a sharp object such as a knife across the face can cut veins. When blood is pulled down into the heart, the veins pull down, they'll pull blood down, but if there's open blood vessels and the person is upright, it also sucks air down, just like going down the drain. If you got about [sixty] [cubic centimeters] of air in the heart it causes like a vapor lock like you get in the car, if you get air in the fuel injector system. The vapor lock[s] and it stops the heart from pumping because the air blocks blood from entering.

4

The following was elicited during cross-examination:

Q[:]  What did you find in the EMT record that caused you to conclude that it was air infiltration as opposed to blood loss that caused [the victim]'s death?

A[:]  There wasn't enough blood loss to explain death, but air which is why when people operate on head and neck, they put patients in what's called a reverse Trendelenburg where the feet are higher to prevent this from happening.  But whenever the head is up high, air gets sucked into the heart and people die.  I know that from experience, medical school, and training.

Q[:]  How much blood loss was there?

A[:]  I don't know.

Q[:]  If you just said it wasn't because of blood loss because he didn't lose enough blood to die.  How do you know that if you don't know what the blood loss was?

A[:]  Because it was described what happened, based on the description, it sounded more to me that it was . . . air being sucked into the heart rather than blood loss or a combination of the two.  Either way, it's still an incised wound that killed him.

. . . .

Q[:]  So you don't know if he was prone as opposed to sitting up in the fashion that you described which would result in this air infiltration that you're talking about at the time that he was being treated by the folks in the ambulance.

A[:] Well I doubt he was prone. He might have been supine. Supine is lying on the back, prone is on the face.

But that wouldn't matter, when somebody gets a cut wound to the face and they die suddenly, or arrest suddenly, it's either from blood loss or air. Based on my description of what I've heard I believe it was most likely air that caused it rather than blood loss.

Gloucester County Prosecutors Office (GCPO) detectives reviewed surveillance videos from nearby homes and businesses to identify the truck that was believed to be involved in the incident. Later investigation revealed the truck was registered in defendant's wife name.

The prosecutor obtained a search warrant for the truck and defendant's home. GCPO Detective Yader Barquero recovered two palm prints from the victim's vehicle. GCPO Detective Marie Meyers testified that a utility knife found in the console of the truck tested positive for the presence of blood. However, forensic analysis could not confirm that it was used in the attack. Police did not find a knife in the home, a grey vest, or blue jeans.

In July 2018, defendant was charged by indictment with first-degree knowing/purposeful murder, N.J.S.A. 2C:11-3(a)(1), third-degree possession of weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d), and fourth-degree unlawful possession of a weapon, N.S.J.A. 2C:39-5(d).

6

Defendant was tried in early 2023. After four days of deliberation, the jury returned a verdict acquitting defendant of murder and finding him guilty of the lesser included offense of aggravated manslaughter. Defendant was also convicted of the two weapons charges.

On February 13, 2023, defendant filed a motion for new trial or judgment notwithstanding the verdict pursuant to Rule 3:20-1. In April 2023, a different judge than the one who presided over the trial heard arguments on defendant's motions. On May 24, the judge denied the motions, rendering a twenty-page written decision.

On June 29, defendant was sentenced on the aggravated manslaughter conviction to a twenty-four-year prison term subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. The judge merged the two weapons counts and imposed a concurrent four-year term of imprisonment.

This appeal followed. Defendant raises the following contentions for our consideration:

> POINT I
>
> THE [TRIAL] COURT'S INSTRUCTION ON THE LESSER INCLUDE OFFENSE OF AGGRAVATED MANSLAUGHTER WAS DEFICIENT ON ITS FACE IN THAT THE INSTRUCTION FAILED TO INSTRUCT[] THE JURY WHERE THE DEF[E]NSE DISPUTED CAUSATION AND WHERE THE

7

VICTIM EXPIRED AS THE RESULT OF BEING REMOVED FROM LIFE SUPPORT. THE FAILURE TO PROVIDE THE JURY WITH THE PROPER INSTRUCTION ACTED TO DENY [DEFENDANT] A FAIR TRIAL. (Not argued [before the trial court]).

POINT II

THE TRIAL COURT COMMITTED ERROR BY DENYING [DEFENDANT]'S MOTION FOR MISTRIAL DURING THE TESTIMONY OF THE STATE'S EXPERT WITNESS ASHLEY TATE.

POINT III

THE JURY VERDICT MUST BE SET ASIDE BECAUSE IT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

II.

We first address defendant's contention the trial court erred in instructing the jury. The parties discussed causation during the charge conference conducted pursuant to Rule 1:8-7(b). The defense requested that the one-page

8                                                                      A-3823-22

model causation charge under N.J.S.A. 2C:2-30 be read to the jury.[2]  The trial court tailored the model charge to remove inapposite references to strict liability and negligent conduct.

The trial court then asked the parties if they wanted the court to instruct the jury on their competing causation theories.  Defense counsel asked for the jury to be instructed that, "but for the care provided by the first responders, that [the victim] would not have died."  Defense counsel then stated that the court "could change it to but for the failure of the care of first responders[,] the victim would not have died."

The trial court expressly inquired as to whether "removal of life support [is] an issue."  The prosecutor stated it was not.  Defense counsel offered no objection, and did not ask the judge to read the model instruction that addresses causation when a person is removed from life support.  See footnote 3.

At trial, the court charged the jury on the legal principles governing causation during several portions of the final instructions.  The court provided a general causation charge that explained the death must not have been "too remote, too accidental in its occurrence, or too dependent on another's volitional act."  It further explained to the jury the parties' legal theories regarding causation, stating, "[t]he theories alleged in this case, the State asserts that [the

The model jury charge on caus]ation is as follows:

Causation has a special meaning under the law. To establish causation, the State must prove two elements, each beyond a reasonable doubt:

First, but for the defendant's conduct, the result in question would not have happened. In other words, without defendant's actions the result would not have occurred.

**[WHEN PURPOSEFUL OR KNOWING CONDUCT INVOLVED]**

Second, the actual result must have been within the design or contemplation of the defendant. If not, it must involve the same kind of injury or harm as that designed or contemplated, and must also not be too remote, too accidental in its occurrence or too dependent on another's volitional act to have a just bearing on the defendant's liability or on the gravity of his/her offense.

**[WHEN RECKLESS OR NEGLIGENT CONDUCT INVOLVED]**

Second, [for reckless conduct] that the actual result must have been within the risk of which the defendant was aware. If not, it must involve the same kind of injury or harm as the probable result and must also not be too remote, too accidental in its occurrence or too dependent on another's volitional act to have a just bearing on the defendant's liability or on the gravity of his/her offense.

A-3823-22

victim] would not have died, but for [defendant] cutting him with the knife. [Defendant] asserts that but for the failure of care provided by the first responders, [the victim] would not have died." Defendant did not object to the court's instructions.

---

Second, [for negligent conduct] that the actual result must have been within the risk of which the defendant should have been aware. If not, it must involve the same kind of injury or harm as the probable result and must also not be too remote, too accidental in its occurrence or too dependent on another's volitional act to have a just bearing on the defendant's liability or on the gravity of his/her offense.

**[ABSOLUTE OR STRICT LIABILITY]**

Second, the actual result must have been a probable consequence of the defendant's conduct. It must not be too remote, too accidental in its occurrence or too dependent on another's volitional act to have a just bearing on the defendant's liability.

[Model Jury Charges (Criminal), "Causation (N.J.S.A. 2C: 2-3)" (approved June 10, 2013) (emphasis in original).]

11                                                                        A-3823-22

For the first time on appeal, defendant contends the trial court did not provide a "clear definition" of an intervening act or volitional conduct as it relates to causation and provided no "guidance as to whether it could consider that the victim lingered on life support for a period of time after the incident and whether that fact should enter into their deliberations." Defendant stresses that the court did not provide the model charge for a person who is removed from life-support,[3] notwithstanding that trial counsel did not request such model charge when the subject was specifically discussed during the charge conference. Defendant also notes that the State did not offer testimony from the hospital physicians on the victim's condition prior to the removal of life support.

We begin our analysis by acknowledging certain foundation legal principles. A "trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). "The test to be applied [on appeal] . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." Id. at 159 (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)).

12

That model charge reads in pertinent part:

> **[NOTE: In cases where <u>Causation - Removal of Life Support</u> is an issue, the jury should be instructed as follows:**
>
> You have heard testimony that on [date], **(insert victim's name)** was taken off life support and that (he/she) died at some point after this was done. Should you find beyond a reasonable doubt that **(insert victim's name)** died from medical complications that resulted from injuries caused by defendant's actions, the removal of life support, in this case (method of removal), is not an intervening cause that relieves defendant of any criminal liability for those actions. That is, if defendant's actions set in motion **(insert victim's name)** need for life support, without which death would result naturally, then the causal link between defendant's action and the death of **(insert victim's name)** was not broken by an unforeseen, extraordinary act when **(insert victim's name)** was removed from life support and then expired, unless there was an intervening volitional act of another.][]
>
> **(Where the defendant and State offer contrasting factual theories of causation, each version should be summarized for the jury.)**[]
>
> [<u>Model Jury Charges (Criminal)</u>, "Murder and Aggravated/Reckless Manslaughter (N.J.S.A. 2C:11-3a(1) and (2); 2C:11-4a, b(1))" (rev. June 13, 2011) (emphasis in original) (footnotes omitted) (first citing <u>State v. Pelham</u>, 176 N.J. 448, 455-56, n. 2, 467 (2003); and then citing <u>State v. Martin</u>, 119 N.J. 2, 18 (1990))].

13

Appellate courts apply a harmless error analysis when a defendant has objected to a jury charge. State v. Jenkins, 178 N.J. 347, 361 (2004); see also R. 2:10-2; Baum, 224 N.J. at 159. Importantly, however, when as in this case, a defendant does not object to the charge, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v. Montalvo, 229 N.J. 300, 320 (2017) (quoting State v. Singleton, 211 N.J. 157, 182 (2012)).

In State v. Burns, our Supreme Court re-affirmed that:

> In the context of a jury charge, plain error requires demonstration of "[l]egal impropriety of the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [192 N.J. 312, 341 (2007) (alteration in original) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).]

In addition, "[p]ortions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." Jordan, 147 N.J. at 422 (quoting State v. Wilbely, 63 N.J. 420, 422 (1973)). The effect must also be considered "in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

14

Applying these legal principles to the present matter, we see no error, much less plain error, in the trial court's jury instructions with respect to causation.  As noted, the trial court instructed the jury on causation more than once.  It first stated:

> Causation has a special meaning under the law. To establish causation, the State must prove two elements each beyond a reasonable doubt.
>
> First, but for the defendant's conduct, the result in question would not have happened.  In other words, without the defendant's actions the result would not have occurred; and then,
>
> Second, the actual result must have been within the design or contemplation of the defendant.  If not, it must involve the same kind of injury or harm that is designed or contemplating must also not be too remote, too accidental in occurrence, or too dependent on another's volitional acts to have a just bearing on the defendant's liability or on the gravity of his offense.
>
> When it's reckless conduct, . . . the second requirement is that the actual result must have been within the risk of which the defendant was aware.  If not, it must involve the same kind of injury or harm as the probable result, and must also not be too remote, too accidental in occurrence, or too dependent on another's volitional acts to have just bearing on the defendant's liability or on the gravity of his offense.

The trial court also addressed causation in its instruction on the crime of aggravated manslaughter.  The court explained to the jury:

15

And as I've said, causation has a special meaning under the law. And to establish causation, the State must prove two elements beyond a reasonable doubt.

First, that but for the defendant's conduct [the victim] would not have died.

Second, that [the victim]'s death must have been within the risk of which the defendant was aware.

If not, it must involve the same kind of injury or harm . . . as the probable result of the defendant's conduct . . . and must also not be too remote, too accidental in its occurrence, or too dependent on another's volitional acts to have a just bearing on the defendant's liability or the gravity of his offense.

In other words, the State must prove beyond a reasonable doubt that [the victim]'s death was not so unexpected or unusual that it would be unjust to find the defendant guilty of aggravated manslaughter.

The court again instructed the jury on causation in its charge on the offense of reckless manslaughter, tailoring the model charge to reflect the parties' respective causation theories, explaining:

And we've already talked about causation having that special meaning and to establish that causation, the State must prove the two elements.

First, that . . . but for the defendant's conduct, the victim would not have died; and,

Second, that [the victim]'s death must have been within the risk of which the defendant was aware. If not, it must involve the same kind of injury or harm as the probable result of the defendant's conduct, and must

16

also not be too remote, too accidental in its occurrence, or too dependent on another's volitional acts to have a just bearing on the defendant's liability or on the gravity of his offense. In other words, the State must prove beyond a reasonable doubt that [the victim]'s death was not so unexpected or unusual that it would be unjust to find the defendant guilty of reckless manslaughter.

The State asserts that, but for the defendant cutting [the victim] across the face, he would not have died, and the defense asserts that but for the failure of care provided by the first responders, [the victim] would not have died.

We reiterate and stress that defendant did not object to any of these charges, which are in accord with the colloquy during the charge conference.

Defendant relies on State v. Concepcion, 111 N.J. 373, 379 (1988), to support his newly-minted contention that the trial court should have given a more fulsome jury instruction on causation. Defendant's reliance is misplaced. In Concepcion, the Court recognized, "[a]n instruction that is appropriate in one case may not be sufficient for another case. Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case." 111 N.J. at 379. "That requirement [to mold the instruction] has been imposed in various contexts in which the statement of relevant law, when divorced from the facts, was potentially confusing or misleading to the jury." State v. Robinson, 165 N.J. 32, 42 (2000). Here, the

17

trial court molded the model charge to reflect the parties' competing causation theories.

We add that while causation is a question of fact for the jury to decide, "the jury may consider only that which the law permits it to consider." Pelham, 176 N.J. at 466 (citing Martin, 119 N.J. at 15 and Green, 86 N.J. at 287-88). Importantly, our Supreme Court has definitively held "that removal of life support, as a matter of law, may not constitute an independent intervening cause for purposes of lessening a criminal defendant's liability" and that a crime victim's decision to be removed from life support is not "another's volitional act" for the jury to consider. Id. at 465, 461.

Thus, an amplified jury instruction would not have helped defendant's cause. In sum, we conclude the jury was properly instructed on the law as it pertains to causation.

## III.

We turn next to defendant's contention the trial court erred by not granting his motion for a mistrial due to testimony from one of the State's expert witnesses, Ashley Tate. The record shows that two experts testified for the State about the palm print lifted from the victim's truck: Glenn Langenburg, PhD, a forensic scientist and certified latent print examiner, and Ashley Tate, an expert

in friction ridge examination.  The trial court held a <u>Rule</u> 104 hearing to consider defense counsel's request to limit Dr. Langenburg's testimony by precluding him from "offering an opinion that only [defendant] could be the source of a latent print."  The trial court agreed with defense counsel and directed the prosecutor to instruct the witness that he may not state a conclusion that the print was a match.  However, it permitted Dr. Langenburg to testify that "the probability to observe discriminating features in another individual by random chance, within this degree of correspondence is extremely low."

Defendant made a similar request to limit Tate's expert testimony.  The parties agreed that she should be instructed as to the same limitation imposed on Dr. Langenburg.

Dr. Langenburg testified that while the palm print recovered from the victim's vehicle had similarities to defendant's palm print.  He also acknowledged that there was no way to disprove that another person in the world could have the same similarities and, therefore, someone else could have left that palm print.

When asked about the results of her evaluation, Tate testified that she "found that the latent print was made by the same source as one of the—".

A-3823-22

Defense counsel immediately objected and moved to strike the interrupted testimony. The court sustained the objection.

Defendant moved for a mistrial. The trial court denied that request, noting that the objection had stopped the expert's statement mid-sentence. Instead, the court gave a cautionary instruction to the jury that both counsel drafted during a break. Specifically, the trial court instructed the jury:

> Ladies and gentlemen, latent print examiners traditionally claimed to be able to identify the source of a latent print with 100 percent accuracy. These claims were clearly overstated and now are widely recognized as indefensible. While latent print examiners may well be able to exclude the preponderance of the human population of possible sources of a latent print, there's no scientific basis for estimating the number of people who could not be excluded and consequently no scientific basis for determining when the pool of possible sources is limited to a single person.

A decision to grant or deny a motion for mistrial is addressed to the sound discretion of the trial judge and will not be disturbed on appeal absent a clear showing of an abuse of discretion. State v. Smith, 224 N.J. 36, 47 (2016); State v. Jackson, 211 N.J. 394, 407 (2012). "The grant of a mistrial is an extraordinary remedy to be exercised only when necessary 'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). "[A]n appellate court will not disturb a trial court's

A-3823-22

ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice." Jackson, 211 N.J. at 407 (quoting Harvey, 151 N.J. at 117). The same deferential standard that applies to the decision whether to grant a mistrial applies to an appellate court's review of a curative instruction delivered in lieu of granting a mistrial. State v. Winter, 96 N.J. 640, 647 (1984).

As we explained in State v. Smith, "[o]f course, declaring a mistrial is never a preferred course." 471 N.J. Super. 548, 579 (App. Div. 2022). "If there is 'an appropriate alternative course of action,' a mistrial is not a proper exercise of discretion." Smith, 224 N.J. at 47 (quoting State v. Allah, 170 N.J. 269, 281 (2002)). "For example, a curative instruction, a short adjournment or continuance, or some other remedy, may provide a viable alternative to a mistrial, depending on the facts of the case." Ibid. The determination of whether an instruction or mistrial is warranted "is one that is peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting." Winter, 96 N.J. at 647.

Relatedly, juries are "deemed capable of following a curative instruction to ignore [a] prejudicial matter." State v. Ribalta, 277 N.J. Super. 277, 292 (App. Div. 1994) (citing Williams v. James, 113 N.J. 619, 632 (1989)). "[I]n

administering the criminal law[,] the courts must rely upon the jurors' ability and willingness to follow the limiting instruction without cavil or question." Ibid. (quoting State v. Manley, 54 N.J. 259, 270 (1969)).

In State v. Herbert, this court outlined an analytical framework that trial courts should use when determining whether to give a curative instruction rather than granting a motion for a mistrial. 457 N.J. Super. 490, 505-07 (App. Div. 2019). Herbert identified three relevant factors: (1) "the nature of the inadmissible evidence the jury heard, and its prejudicial effect[;]" (2) "an instruction's timing and substance[;]" and (3) "the risk of imperfect compliance." Ibid.

Applying these principles, we are satisfied the curative instruction was adequate in these circumstances and the trial court did not abuse its discretion by denying defendant's motion for a mistrial. See State v. Papasavvas, 163 NJ. 565, 614 (2000); State v. Prall, 231 N.J. 567 (2018); Yough, 208 N.J. at 397; State v. McKinney, 223 N.J. 475 (2015).

IV.

Finally, we address defendant's contention the jury verdict must be set aside because it was against the weight of the evidence. Specifically, defendant argues that "[t]he cumulative effect of the lack of direct or circumstantial

22

evidence of [d]efendant's involvement together with the presentation of strong evidence of another likely assailant [his thirty-five-year-old son] and the violation of the [c]ourt's [o]rder cumulated to deny [d]efendant a fair trial and constituted a miscarriage of [j]ustice." In essence, defendant contends the guilty verdict was based on circumstantial evidence, the jury ignored evidence of third-party guilt, and the verdict was compromised by the witness misconduct we addressed in the preceding section.

We begin our analysis by noting the motion court issued a comprehensive ruling. The motion court first explained that the State satisfied the "beyond a reasonable doubt standard." It noted that circumstantial evidence is permitted and that, as explained in the model jury charges, the jury can "may allot as little or as much weight [to circumstantial evidence] as it sees fit." The court then addressed defendant's identification issues, holding that "[t]here is no need for the State to pinpoint [d]efendant's identity in the proffered video. If there was enough evidence furnished to allow the jury to draw reasonable inferences from one established fact to the next, that is all which is required of the State."

Further, the motion court addressed defendant's contentions that the jury "ignored evidence" that the son may have been the attacker. The court concluded that "he has no proof of such—that is simply [defendant's]

23

interpretation of the verdict." The court added that the jurors did consider this evidence, which "is specifically illustrated by jurors asking questions about the cellphone and who it belonged to." Moreover, the court noted "defense counsel showed the jury a photograph of [d]efendant and [d]efendant's son, therefore, the jury knew what age the son was compared to [d]efendant, as well as had an opportunity to compare their looks and features."

The law is well-settled that "[a] trial court's ruling on a motion for a new trial 'shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law.'" State v. Armour, 446 N.J. Super. 295, 305 (App. Div. 2016) (quoting R. 2:10-1). The motion "is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." Id. at 306 (footnote omitted) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)); see also Smith, 224 N.J. 3 at 47; Jackson, 211 N.J. at 407.

Rule 3:20-1 states, "[t]he trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice." "[P]ursuant to Rule 3:20-1, the trial judge shall not set aside a jury verdict unless 'it clearly and convincingly appears that there was a manifest denial of justice under the law.'" Armour, 446 N.J. Super. at 305-06.

"The standard of review on appeal from decisions on motions for a new trial is the same as that governing the trial judge—whether there was a miscarriage of justice under the law." Hayes v. Delamotte, 231 N.J. 373, 386 (2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011)); see also R. 4:49-1(a). "[A] 'miscarriage of justice' can arise when there is a 'manifest lack of inherently credible evidence to support the finding,' when there has been an 'obvious overlooking or under-valuation of crucial evidence,' or when the case culminates in 'a clearly unjust result.'" Hayes, 231 N.J. at 386 (quoting Risko, 206 N.J. at 521-22). In evaluating the trial court's decision to grant or deny a new trial, "an appellate court must give 'due deference' to the trial court's 'feel of the case,'" however, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Ibid. (alteration in original) (first quoting Risko, 206 N.J. at 522; and then quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

We are mindful that in this instance, the judge who presided over the trial was not the judge who decided the motion for a new trial. See footnote 1. Even so, this alone does not support an abuse of discretion warranting our intervention. The motion judge's findings were amply supported. Nor was there

a miscarriage of justice. The jury was properly instructed and there is no basis upon which to second guess its decision to acquit defendant of murder but convict him for the lesser included crime of aggravated manslaughter.

To the extent we have not specifically addressed them, any remaining arguments made by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-3823-22